UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RANDALL ULBRICHT, Individually and on behalf of all others similarly situated, | Case No. 1:18-cv-06801-PKC-RLM |
| Plaintiff, | AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| v. | JURY TRIAL DEMANDED |
| TERNIUM S.A., DANIEL AGUSTIN NOVEGIL, MAXIMO VEDOYA, PABLO BRIZZIO, and PAOLO ROCCA, | CLASS ACTION |
| Defendants. | |

Lead Plaintiff Hunter Payne and named plaintiff Randall Ulbricht ("Plaintiffs" or "Investors"), individually and on behalf of all other persons similarly situated, by Investors' undersigned attorneys, for Investors' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Investors and Investors' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Investors' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ternium S.A. ("Ternium" or the "Company"), analysts' reports and advisories about the Company, and Argentine court documents in Case 9608/2018 before the Argentine National Court for Criminal and Correctional Matters (the "Notebooks Case"). Investors believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants, who purchased or otherwise acquired the publicly traded securities of Ternium from May 1, 2014 through November 27, 2018, inclusive (the "Class Period"). Investors seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Ternium is one of Latin America's leading manufacturers of steel products.  Up until 2008, Sidor CA ("Sidor"), located in Venezuela was one of Ternium's largest and most important subsidiaries and was one of Ternium's three manufacturing subsidiaries. Ternium owned 59.7% of Sidor with the Venezuelan government owning the remainder.

3.      In 2006 Venezuelan President Hugo Chavez began forcing oil companies into joint ventures and nationalized the cement industry.

4.      In 2007, Chavez threatened to take over Sidor, saying that Ternium refused to supply the local market and operated as a monopoly.  Ternium dodged nationalization at first by promising to sell more discounted steel in Venezuela.  But on April 9, 2008 Chavez ordered the nationalization of Sidor, accusing it of slave-like working conditions and owing as much as $700 million in taxes.

5.      At the time, the Chavez government had nationalized numerous companies while failing to pay any compensation.  Indeed, the Venezuelan government owed over $10 billion in unpaid nationalizations. Accordingly, analysts expected that Ternium might receive nothing for its transfer of Sidor to the Venezuelan Government.

6.      However, in the second half of 2008 Chavez softened his stance, stating that he expected a "friendly agreement" concerning the terms of the nationalization of Sidor.  Chavez

had a meeting with Argentine President Cristina Fernandez de Kirchner to discuss compensation negotiations.

7.     On May 7, 2009 Ternium announced that it had reached a deal with the Venezuelan government to sell Sidor for $1.97 billion. Analysts deemed this a "windfall" and Ternium's stock price rose the most in three years- by a whopping 49%.

8.     Unbeknownst to investors, Ternium had secured the deal by paying illegal bribes to Argentine government officials who leveraged their relationships with Chavez to advocate on Ternium's behalf.

9.     Between April and December 2008 Ternium made a series of eight bribe payments totaling over one million dollars to Argentine government officials. The payments were made in cash at the instruction of Ternium Corporate director Luis Betnaza.

10.    To keep anyone from discovering the payments Ternium arranged for Roberto Baratta, former Undersecretary at the Planning Ministry, to pick up the bags of cash from Hector Zabaleta, former Ternium employee and trusted friend of Ternium Chaiman Paolo Rocca in the subbasement of the Ternium building where no cameras were present. On most occasions Baratta delivered the payments directly to president Cristina Fernandez de Kirchner or her private secretaries at the Presidential residence in Buenos Aires or at the Executive Mansion.

11.    Defendants kept these bribes a secret for ten years, reassuring investors that the Company had in place numerous mandatory and enforceable policies strictly prohibiting bribery.

12.    Prior to and during the Class Period Ternium touted not only one but three robust and detailed policies designed to assure investors that the Company had a zero-tolerance policy toward bribery and payments to government officials, and that bribery was strictly prohibited. Ternium's Code of Ethics, Code of Conduct and Policy on Business Conduct were mandatory,

3

with the Code of Conduct applying to all employees, the Code of Ethics applying to Senior Financial Officers, and the Policy on Business Conduct applying to officers, directors, employees and Company subsidiaries, with the additional requirement that the CEO be held responsible for ensuring compliance. Ternium referenced each of these policies in each Form 20-F Ternium filed with the SEC during the Class Period.

13.     In each of Defendants' Class Period 20-F's they also touted Ternium's sale of Sidor to the Venezuelan government, omitting the fact that the sale and the proceeds therefrom were the direct result of Defendants' undisclosed illegal bribery scheme. Indeed, the Venezuelan government paid Ternium nearly $2 billion for its stake in Sidor. This was a windfall according to analysts who predicted that Ternium would likely receive no compensation at all. This would have been the likely outcome but for Defendants' bribery scheme.

14.     Defendants also assured investors that Ternium's internal control over financial reporting was effective, with Defendants Novegil (Ternium's CEO) and Brizzo (Ternium's CFO) attesting to the integrity of the Company's internal controls, despite that the internal controls were so inadequate that Company funds were used to pay bribes.

15.     Additionally, Ternium's risk disclosures in each of its Class Period 20-F's set forth a litany of specific risks to its business related to "economic and political instability in Argentina." Conspicuously absent from these risks disclosures was any mention of the risks related to the Company having engaged in illegal bribery with Argentine government officials.

16.     It was not until 2018 that investors would begin to learn the truth.

17.     In early August 2018 news articles in the U.S. and Argentina reported that twelve years-worth of handwritten notebooks (the "Notebooks") detailing illegal political payments to Argentine government officials had led to dozens of arrests.

4

18.     Roberto Baratta (deputy to the former Minister of Federal Planning during Kirchner's presidency) employed Oscar Centeno as his driver. Centeno kept handwritten Notebooks where he meticulously detailed delivering bags of cash to numerous employees of the National Executive Branch of the Argentine government, including Presidents Nestor Kirchner and Cristina Fernandez de Kirchner during the period from 2003 to 2015.

19.     Centeno gave eight of his Notebooks to Diego Cabot, a journalist at Argentine newspaper La Nacion. Cabot worked on a story for months and then passed the Notebooks on to Argentine prosecutor Carlos Stornelli.

20.     In the handwritten Notebooks, Centeno meticulously detailed the bribe payments that Argentine businessmen gave to his boss Baratta in bags of cash, writing down the times and even the weights of bags of money he delivered while driving around Buenos Aires.

21.     By the end of August 2018 at least 26 high-profile individuals were arrested, with 15 prominent business leaders and two high-ranking government figures striking plea deals with the government. Investigators also raided the homes owned by Cristina Fernandez de Kircher.

22.     Claudio Bonadio, the federal judge in the Notebooks case, stated that the Notebooks and other related evidence exposed "a criminal organization made up of public officials between the years 2008 and 2015 [that] sought the payment of illegitimate sums of money from numerous private citizens, many of them public works contractors."

23.     Indeed, Centeno's Notebooks specifically detailed bribe payments from Ternium's Hector Zabaleta to Argentine government officials.

24.     On November 27, 2018 news outlets reported that Judge Bonadio had formally charged Ternium's Chairman of the Board Paolo Rocca ("Rocca") in the Notebooks Case. The judge charged Rocca with payment of bribes and illicit association.

25.     The charges against Rocca came after Rocca provided a statement to the Argentine Court as part of the investigation that one of his Company's executives, Luis Betnaza, had instructed Ternium employee Hector Zabaleta to pay an undisclosed amount of cash to Argentine government officials in eight monthly installments in 2008. The government officials were working for then-President Cristina Fernandez de Kirchner's administration.  The payments were to speed up a compensation payment from Hugo Chavez for the nationalization of Sidor. The judge set a $103 million bond and forbade Rocca from leaving the country.

26.     On this news, Ternium's stock dropped fell $1.42 per share or nearly 5%, trading at over eight times the previous day's volume, to close at $28.02 per share on November 27, 2018.

## JURISDICTION AND VENUE

27.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

28.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

29.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

30.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

31.     Lead Plaintiff Hunter Payne purchased Ternium ADS at artificially inflated prices during the Class Period and has been damaged thereby.  His PSLRA certification was previously filed with this Court. (Dkt. No. 6-2) and is incorporated by reference herein.

32.     Plaintiff Randall Ulbricht purchased Ternium ADS at artificially inflated prices during the Class Period and has been damaged thereby.  His PSLRA certification was previously filed with this Court (Dkt. No. 1-1) and is incorporated by reference herein.

33.     Defendant Ternium, through its subsidiaries, manufactures and processes various steel products in Mexico, Argentina, Paraguay, Chile, Bolivia, Uruguay, Brazil, the United States, Colombia, Guatemala, Costa Rica, Honduras, El Salvador, and Nicaragua. The Company is incorporated and based in Luxembourg. The Company's American Depository Shares ("ADS") are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "TX." Up until 2008, Sidor C.A. ("Sidor") was one of Ternium's largest and most important subsidiaries, being one of Ternium's three manufacturing subsidiaries.

34.     Defendant Paolo Rocca ("Rocca") has been the Chairman of the Company's Board since 2005. Rocca is also Chairman and CEO of Tenaris, S.A. ("Tenaris"). Tenaris produces and sells steel tubular products and related services. Tenaris held 11.46% of Ternium's share capital as of December 31, 2017. Rocca is also the grandson of Agostina Rocca, founder of the Techint Group, a group of six companies of which Ternium is one.  Rocca was indicted in the Notebooks Case on November 27, 2018.

35.     Defendant Daniel Agustín Novegil ("Novegil") served as the Company's Chief Executive Officer ("CEO") from 2005 until 2018. He currently serves as a director and Vice Chairman of the Board of Directors (the "Board").  Novegil was also appointed the chairman and

chief executive officer of Sidor in 1998.  In 2003 Novegil was given executive responsibilities over Sidor.

36.     Defendant Máximo Vedoya ("Vedoya") has served as the Company's CEO since March 1, 2018.

37.     Defendant Pablo Brizzio ("Brizzio") has been the Company's Chief Financial Officer ("CFO") throughout the Class Period.  Defendant Brizzio placed Ternium Corporate Director Luis Betnaza in charge of traveling to Venezuela along with Argentine government officials to negotiate the terms of the Sidor takeover.

38.     Defendants Novegil, Vedoya, Brizzio, and Rocca are sometimes referred to herein as the "Individual Defendants."

39.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

40.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

41.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

42.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## RELEVANT NON-PARTIES

43.     Hector Zabaleta ("Zabaleta") is the former director of administration of Techint's Engineering and Construction company and is reportedly one of the men closest to Ternium Chairman Paolo Rocca. While Zabaleta is technically retired from the Company, prior to and during the Class Period Zabaleta continued carrying out business for Ternium and its shareholders, and "had the confidence of the Techint Group" despite having no official executive position at the time. The Argentine Federal Criminal Court formally charged Zabaleta with bribery and conspiracy in the in the Notebooks Case.

44.     Luis Betnaza ("Betnaza") has been a Corporate director at Ternium since 2001 and receives a salary of approximately $700,000 per month. Betnaza was "nominated" by Defendant Pablo Brizzio and others to seek the Argentine government's help in dealing with Venezuela's nationalization of Sidor.  The Argentine Federal Criminal Court formally charged Betnaza with bribery and conspiracy in the Notebooks Case.

45.     Roberto Baratta ("Baratta") is a former Federal Planning Ministry official for Argentine Government under Federal Planning Minister Julio De Vido during the presidencies of Nestor Kircher and Cristina Fernandez de Kirchner.  Baratta was put in charge of collecting bribe

payments, often tendered in the form of bags of money, from various Argentine businesspeople and companies (including Ternium) and delivering the money to the Kirchners or other government officials. The Argentine Federal Criminal Court formally charged Baratta with bribery and conspiracy in the in the Notebooks Case.

46.     Oscar Centeno ("Centeno") was the driver for former Argentine government planning secretary Roberto Baratta. Centeno kept handwritten Notebooks from 2005 to 2015 containing meticulous notes about the details of bribe payments that he delivered from Argentine businesses, including Ternium, to government officials. The Argentine Federal Criminal Court formally charged Centeno with bribery and conspiracy in the Notebooks Case.

47.     Cristina Fernandez de Kirchner ("Cristina Kirchner") was the President of Argentina from December 10, 2007 through December 9, 2015 and was married to the late Nestor Kirchner.  The Argentine Federal Criminal Court formally charged Cristina Kirchner in the Notebooks Case.

48.     Nestor Kirchner ("Kirchner") was the President of Argentina from May 25, 2003 through December 10, 2007.  Instead of seeking reelection, Kirchner stepped down in 2007 in support of his wife, Cristina Kirchner.  Kirchner died in October 2010.

## ALLEGATIONS OF MISCONDUCT

### *Organization of Ternium*

49.     Ternium is a leading steel producer in Latin America.  Ternium manufactures and processes a broad range of value-added steel products, including galvanized and electro-galvanized sheets, pre-painted sheets, tinplate, welded pipes, and hot-rolled and cold-rolled steel, as well as slit and cut-to-length offerings through its service centers for customers operating in construction, home appliances, capital goods, container, food, energy and automotive industries.

Ternium also produces long steel products, such as bars and wire rod, and metal building components.

50.     Ternium has production facilities located in Argentina, Brazil, Guatemala, Mexico and the United States, as well as a network of service and distribution centers in Latin America.

51.     Ternium is part of Techint, which is a group of companies consisting of Ternium, Tenaris, Tenova, Tecpetrol and Humanitas.  Techint was founded as an international corporation in 1945 by Italian steel magnate Agostino Rocca, grandfather of current Chairman Paola Rocca.

52.     In 1992 in Argentina, Techint acquired the state-owned Somisa steel company. Together with Propulsora Siderugica, they created Siderar, currently a Ternium subsidiary.

53.     In 1998 Sidor, a steel company located in Venezuela, was private. The "Amazonia Consortium" consisting of Techint, Hylsamex and Usiminas won control over it.

54.     Then, in 2005 the Techint Group acquired Hysla (in Mexico).  Hysla, Siderar and Sidor thereby created Ternium.

55.     Ternium began trading on the New York Stock Exchange (NYSE) in 2006.

### *Venezuela's Nationalization of Sidor*

56.     In 2006 Venezuelan President Hugo Chavez began forcing oil companies into joint ventures and nationalized the cement industry.

57.     In 2007, Chavez threatened to take over Sidor, saying that Ternium refused to supply the local market and operated as a monopoly.  Ternium dodged nationalization at first by promising to sell more discounted steel in Venezuela.  But on April 9, 2008 Chavez ordered the nationalization of Sidor, accusing it of slave-like working conditions and owing as much as $700 million in taxes.

58.     On April 9, 2008 Ternium issued a press release announcing that Venezuela's Vice President informed it of the Venezuelan Government's intention to nationalize Sidor.

59.     On April 30, 2008 Ternium announced that the National Republic of Venezuela passed a resolution declaring that Sidor was of public and social interest and authorizing the Venezuelan government to "take any action it may deem appropriate in connection with any such assets, which may include expropriation." Ternium stated that it "is prepared to continue discussions with the Venezuelan government regarding the adequate and fair terms and conditions upon which all or a significant part of Sidor would be transferred to the government."

60.     Then, in the second half of 2008, Chavez changed his stance, softening, stating that he expected a "friendly agreement" and that he hoped the Rocca-run company would continue to work with Venezuela. In late June 2008, Chavez met with Argentine President Cristina Fernandez de Kirchner to discuss compensation negotiations.

61.     On July 14, 2008 Ternium announced that the terms provided in the Venezuelan government's decree for the negotiation of the conditions under which Sidor will be transferred to Venezuela was extended to August 18, 2008.

62.     On May 7, 2009 Ternium issued a press release announcing the completion of the transfer of its 59.7% interest in Sidor to CVG (Corporacion Venezolana de Guayana, i.e. a Venezuelan state-run corporation). Ternium announced that it had agreed that the Venezuelan government would pay Ternium an aggregate amount of $1.97 billion as compensation for its Sidor shares.  Of that amount, CVG paid Ternium $400 million in cash that day.  The balance would be divided into two tranches: the first tranche of $945 million would be paid in six quarterly installments, while the second tranche would be paid at maturity in November 2010,

subject to quarterly mandatory prepayment events based on the increase of the WTI crude oil price over its May 6, 2009 level.

63.     On May 7, 2009 Bloomberg reported that Ternium had reached an agreement with the Venezuelan government to sell its Sidor unit for $1.97 billion, ending a yearlong price dispute.  On this news, Ternium's stock price rose the most in three years, $5.16 per share or 49 percent, to $15.67, the largest gain since January 31, 2006.

64.     This was a victory for Ternium.  According to Argentine press reports, Chavez had first offered $800 million as compensation after seizing the Company.

65.     Analysts were shocked at the compensation Venezuela agreed to give Ternium. In a May 7, 2009 report by Deutsche Bank, titled "Windfall- TX to receive nearly $2B from Vene; move to hold" Deutsche Bank analysts reacted to the news that Ternium reached a settlement with Venezuela to sell its interest in Sidor for $1.97B stating "In total, we were surprised by the timing and value realized and we therefrom upgrade TX to Hold from Sell. ***Our prior valuation of Ternium assumed zero value for its interest in Sidor***,[1] and this resolution addresses many of the concerns (i.e. balance sheet) we had with the Company.

66.     An analyst at Argus research stated that if Ternium "got something closer to $2 billion, then that is a good deal…The only thing you would have to worry about is if the Venezuelan government agrees to its end of the deal."

67.     Unbeknownst to investors, the Venezuelan government's "end of the deal" was ensured by Ternium paying illegal bribes to Argentine government officials who leveraged their relationships with Chavez to advocate on Ternium's behalf.

---

[1] All emphasis is added unless otherwise noted.

68.     At the time Ternium announced its agreement with Venezuela, Venezuela still owed about $10 billion for unpaid nationalizations to various companies. Unaware of Ternium's bribe payments, analysts believed that Ternium's favorable agreement with Venezuela might be a sign that those companies would similarly receive payments.

### *The "Notebooks" Scandal Uncovers Ternium's Illegal Bribery*

69.     In early August 2018 news articles in the U.S. and Argentina reported that twelve years-worth of handwritten notebooks detailing illegal political payments to Argentine government officials had led to dozens of arrests.

70.     Oscar Centeno, who was employed as a driver by Roberto Baratta, (deputy to Julio De Vido- the former Minister of Federal Planning during Kirchner's presidency) kept handwritten notebooks where he meticulously detailed delivering bags of cash to government officials during the period from 2003 to 2015.

71.     Centeno gave eight of his notebooks to Diego Cabot, a journalist at Argentine newspaper La Nacion.  Cabot worked on a story for months and then passed the notebooks on to Argentine prosecutor Carlos Stornelli.

72.     In the handwritten notebooks, Centeno meticulously detailed the bribe payments- in the form of bags of cash- that various Argentine business people gave Centeno.  Centeno recorded the times and even the weights of bags of money he delivered while driving around Buenos Aires. In the Notebooks, Centeno listed the addresses he visited and various other details, such as how often Baratta went to the gym.

73.     Centeno's entries in the Notebooks describe how the monies ended up in the hands of Roberto Baratta, one of the most trusted officials of former Planning minister Julio De Vido.  On almost all occasions, Centeno delivered the money to officials in the Executive Branch

in the Argentine government or to their private secretaries at the Presidential Residence at Olivos or the Executive Mansion where former president Cristina Fernandez de Kirchner and the late Nestor Kirchner lived.

74.     By the end of August 2018 at least 26 high-profile individuals were arrested, with 15 prominent business leaders and two high-ranking government figures striking plea deals with the government.  Investigators also raided the homes owned by Cristina Fernandez de Kircher.

75.     Claudio Bonadio, the federal judge in the Notebooks case, stated that the Notebooks and other related evidence exposed "a criminal organization made up of public officials between the years 2005 and 2015 [that] sought the payment of illegitimate sums of money from numerous private citizens, many of them public works contractors."

76.     Confessions in the case were prompted by a recent Argentine law that went into effect in 2016 and established a mechanism for criminal suspects to negotiate leniency in exchange for cooperation with law enforcement officials. This change in legal criminal procedure resembles the legal change that took place in Brazil and paved the way for the *Lavo Jato*, i.e., the "Car Wash" investigation which led to the successful prosecutions of dozens of politicians and business people.

77.     Centeno's notebooks specifically detailed bribe payments from Ternium to Argentine government officials.  For example, on May 29, 2008 Centeno named Hector Zabaleta for the first time, writing "I took [Baratta] to the Techint building to meet Hector, gave him the bag and took him to his apartment. We went to leave the bags to Uruguay 1306 [i.e. the Executive Mansion] for Daniel Munoz [then private secretary to Nestor Kirchner]."

78.     Seventy-two-year-old Hector Zabaleta has been linked to Techint for 48 years and is on the boards of almost thirty companies in Argentina, almost all of which are in turn linked to

Techint and its executives, including Rocca. At Ternium, Zabaleta managed a floor with restricted access. Zabaleta had secretaries and a safe which he was readily able to replenish. Zabaleta's ready access to Company funds and his high security clearance within the Company indicate that Ternium's upper level management entrusted Zabaleta with significant authority and considered him a member of their inner circle.

79.     In August 2018 Argentine prosecutors charged Zabaleta in the Notebooks Case, along with Ternium Corporate Director Luis Betnaza.

80.     According to an article in the Buenos Aires Times, Betnaza travelled to Venezuela several times with Ternium CEO Daniel Novegil in connection with their negotiations with Venezuelan officials over Sidor.

81.     According to the same article, U.S. government cables from reveal that Ternium was trying to persuade Cristina Fernandez de Kircher to intervene on the Company's behalf with Hugo Chavez.

82.     On November 27, 2018 news outlets reported that Judge Bonadio had formally charged Defendant Rocca in the Notebooks Case. The judge charged Rocca with payment of bribes and illicit association.

83.     The charges against Rocca came after Rocca provided a statement as part of the investigation that one of his Company's executives (Hector Zabaleta, at the instruction of Ternium Corporate Director Luis Betnaza) paid an undisclosed amount of cash to Argentine government officials in eight monthly installments in 2008.  As Zabaleta and Betnaza testified, driver Oscar Centeno drove Roberto Baratta to the second subbasement of the Ternium building where no cameras could detect his vehicle. These eight trips took place between April and December 2008.  Each time, Zabaleta gave Baratta a bag of money filled with cash.  The bags of

money were bribe payments to Argentine government officials in exchange for their intervention with the Venezuelan government to procure a good deal for Ternium in connection with the sale of Sidor. After Zabaleta handed the bags of cash to Baratta, Centeno drove Baratta to the Presidential Residence at Olivos or the Executive Mansion to deliver the bribe payments directly to members of the Executive Branch of the Argentine government or their private secretaries. The government officials were working for then-President Cristina Fernandez de Kirchner's administration. The payments were to speed up a compensation payment from Hugo Chavez for the nationalization of Sidor. The judge set a $103 million bond and forbade Rocca from leaving the country.

84. On this news, Ternium's stock dropped fell $1.42 per share or nearly 5%, trading at over eight times the previous day's volume, to close at $28.02 per share on November 27, 2018.

85. While Rocca disclaimed having been aware of or authorizing the bribe payments, Rocca became directly involved with Sidor after Venezuela announced nationalization plans. For example, a May 15, 2007 Reuters article quotes Luis Betnaza as describing Rocca's role in meeting with the Venezuelan government concerning Sidor. On May 15, 2007, Betnaza told Reuters that Rocca, Novegil and Ternium Sidor Executive President Julian Eguren would meet with Venezuelan Vice President Jorge Rodriguez. The article stated that despite the fact that Nestor Kirchner and Hugo Chavez are "South American allies and fellow leftists" Kirchner had telephoned Chavez on Ternium's behalf.

86. Indeed, the November 27, 2018 charge against Rocca which Judge Bonadio signed states that Rocca participated in the bribe payments and given his position as well as other

evidence adduced in the Notebooks Case, it was impossible that he was unaware of the bribe payments.

### *Testimony Confirms Ternium's Illegal Bribery Scheme*

87.     On August 7, 2018 Hector Zabaleta testified before the National Prosecutor's Office for Federal Criminal and Correctional Matters in Buenos Aires, Argentina. Zabaleta testified as follows[2]:

88.     About ten days before making delivery of the first of a series of bribe payments, Roberto Baratta (former Undersecretary of Management Coordination and Control at the Planning Ministry in the Kirchner government) telephoned Zabaleta. This conversation was friendly, with Barratta informing Zabaleta that he was Vice Minister to De Vido, (then Minister of Federal Planning, Public Investment and Services) and that he had spoken to Luis Betnaza, Ternium's corporate director, who gave him Zabaleta's phone number so that he could call him. During the call, Baratta told Zabaleta that Ternium must make payments to Baratta in dollars pursuant to Ternium's agreement with the Argentine government. Zabaleta informed Baratta that he could only give him pesos, not dollars because Ternium didn't have the liquidity for dollars.

89.     After this first telephone call with Baratta, Zabaleta spoke to Betnaza, who told him that Ternium had an agreement with the government, and provided a figure, which in pesos, equaled approximately one million dollars.  Zabaleta told Betnaza that dollars wouldn't work because "there weren't any" whereupon Betnaza told Zabaleta to arrange making the payments directly with Baratta and "see what [Zabaleta] could do."

90.     After these conversations transpired, Baratta then came to Zabaleta looking for money.  Zabaleta estimated that this was the largest package of all the deliveries, calculating that

---

[2] An original and an English translation of Hector Zabaleta's testimony is attached hereto as Exhibit A.

it could have been approximately two million pesos. Zabaleta brought a travel bag containing the money to the second subbasement of the Ternium building where he met Baratta. Baratta grabbed the bag containing the money and left it on the floor of the backseat of the car he came in, which was a Toyota Corolla.

91. Between the months of April and December 2008 Baratta came to the second subbasement of the Ternium building eight times, to pick up eight separate bribery payments in bags containing cash. Each time, Zabaleta met Baratta and gave him the bag of cash. Zabaleta made the bribery payments to Baratta between the months of April and December 2008.

92. Baratta always picked up the money in the same car, a Toyota Corolla that Oscar Centeno drove.

93. Like the first delivery, Zabaleta made subsequent deliveries to Baratta in packages with the cash stuffed in brown paper envelopes with pleats that would make them open wider.

94. Baratta telephoned Zabaleta prior to each delivery, each time demanding dollars and insisting that pesos didn't work, making various threats each time, but eventually becoming resigned to taking pesos.

95. Zabaleta made all the deliveries to Baratta in the second basement of the Techint building at Della Peolera 297. There were no cameras in the second basement which could show cars passing, which is why Zabaleta and Baratta arranged for the deliveries to take place there.

96. Zabaleta directly ordered security personnel to raise the entry barrier in the Techint building garage and on one or two occasions waited for Baratta outside. He then he got into Baratta's car and they entered the parking garage together.

19

97.    Zabaleta was always the individual who delivered the money to Baratta. He estimates that all of the deliveries combined totaled fifteen to twenty million pesos (between $1.14 and $1.53 million)[3].

98.    On August 10, 2018 Luis Betnaza provided an Investigative Statement to the Federal Prosecutor in Buenos Aires, Argentina.[4]  An investigative statement is an interview with the accused, not under oath and without an obligation by the accused to respond to questions or to make a statement.

99.    Betnaza has been the Corporate director of Techint since 2001.  He stated that he receives a salary of approximately $700,000 per month.

100.    According to Betnaza's Investigative Statement, Betnaza is accused of having entered into a criminal conspiracy with, among others, Roberto Baratta, Oscar Centeno, Julio Miguel de Vido, Nestor Carlos Kirchner, Hector Alberto Zabaleta and "other persons still unidentified" which developed its activities since approximately the beginning of 2008 until November 2015 whose purpose was to "organize a system of collection of funds in order to receive illegal money for the purpose of illegally enriching themselves, and to use part of those funds in the commission of other crimes, all while taking advantage of their positions as employees of the National Executive Branch."

101.    The conspiracy was led by Néstor Carlos Kirchner and Cristina Elisabet Fernández, who both held the position of President of the Argentine Republic, which they exercised between May 25, 2003 and December 9, 2007, and from December 10, 2007 until

---

[3] On December 15, 2008, shortly before Ternium's payment of the final bribe, the exchange rate was 13.11 pesos to one U.S. dollar.
[4] An original and an English translation of Luis Betnaza's Investigative Statement is attached hereto as Exhibit B. The testimonies and court statements referenced herein were not public and were obtained by Investors' investigator.

December 9, 2015, respectively. Driver Oscar Centeno delivered the monies alternatively to the holders of the executive branch or their private secretaries at Uruguay 1306 and Juncal 1411, Buenos Aires, at the Presidential Residence at Olivos, and at the Executive Mansion. Nestor Kirchner and Cristina Fernandez de Kirchner led the conspiracy. Part of this money was redistributed or payments were made to other public officials. The Kirchners placed Julio De Vido (then Minister of Federal Planning, Public Investment and Services) and Roberto Baratta in charge of carrying out the promised payments. For the most part, Baratta and his private secretary physically collected the payments.

102. In total, various Argentine businesses paid thirty-five million, six hundred forty-five thousand U.S. dollars to Argentine government officials during the course of the conspiracy.

103. Betnaza's investigative statement details Betnaza's, and in turn Ternium's, participation in the conspiracy as follows:

104. Betnaza ordered Zabaleta to deliver money from Techint to Argentine government officials as follows:

105. On May 29, 2008 Zabaleta delivered a bag of money to Baratta at the Grupo Techint building located at Calle Della Paolera 299 in Buenos Aires, which was then delivered to Daniel Muñoz (private secretary of Nestor Kirchner) at Calle Uruguay 1306 in Buenos Aires.

106. On August 1, 2008, Zabaleta delivered a package of money to Baratta.

107. On August 27, 2008, Zabaleta delivered a package of money to Baratta at the Grupo Techint building which Baratta then delivered to Daniel Muñoz.

108. On October 30, 2008 Zabaleta entered a vehicle driven by Oscar Centeno, which then entered the underground level of the Grupo Techint building where Zabaleta delivered a package of money that was ultimately given to Daniel Muñoz.

109.    Also on October 30, 2008, a person identified as "Ale," on behalf of Grupo Techint, delivered the "dividends of the month" (consisting of approximately 400,000 pesos) to Baratta in the second underground level of the Grupo Techint building.

110.    On December 3rd and 18th, 2008, Zabaleta delivered money to Baratta in the second underground level of the Grupo Techint building.

111.    The charges state that Grupo Techint ordered all of the above payments.

112.    Judge Bonadio asked Betnaza to explain the relationship between Grupo Techint and Venezuela.

113.    Betnaza stated that Sidor was a company Techint/Ternium had that was dedicated to the production of steel, long and flat products and was the second largest steel company in Venezuela. Sidor was acquired by Grupo Techint (Ternium) during the era of Venezuelan President Caldera. Betnaza stated that 2003-2005 coincided with the era of a good relationship between Techint and the Chavez regime, where "the relationship with the Chavez regime was reasonable." He stated that the first "attacks" by the Chavez regime came in 2005 and with some conflicts the Company got through the period until 2007.

114.    Betnaza stated that beginning in 2007 its conflicts with the Chavez government surged. On May 1, 2007 the national government put a paid placement in the daily newspapers denouncing corruption among private entities, which is when the conflict with Venezuela worsened. President Chavez treated the Company as corrupt and stated his intent to nationalize Sidor. In April 2008, the Venezuelan government officially declared that it would nationalize Sidor and asked Ternium to exit it by the end of July 2008 so that the transfer in management could take place. Betnaza stated that Chavez began "harassing" the Company concerning non-

compliance with tax, environmental and labor laws, in part to lower the price of compensation for Sidor.

115.   Betnaza stated that it was at that time that Pablo Brizzio and others nominated him to ask for help from the Argentine national government.

116.   Betnaza stated that between February and March 2008 he spoke with the federal planning people in the Kirchner Government who maintained links with Venezuela.  Betnaza stated that he attended presidential meetings with Chavez and a dinner at the home of Claudio Uberti (former head of the Argentine federal agency that regulates highway concessions who also had personal ties to Nestor Kirchner) which took place prior to the nationalization of Sidor. After a "friendly dinner" Uberti approached Betnaza and told him about Kirchner's anger, alleging that the Company had not contributed financially to the government.  Betnaza stated that he told Uberti that "Grupo Techint doesn't make deals, ever, with politics."  Betnaza stated that it was his opinion that the conversation closed the link to Chavez.

117.   But, at the beginning of 2008 Ternium appealed to the Argentine government and the officials at the Federal Planning Ministry who told Ternium to "make a contribution." Betnaza state that DeVido raised the issue of a "contribution," and that Baratta arranged the quantity of the payments and form of the payments.  Thereafter, Betnaza attended meetings with the Chavez government concerning compensation for Sidor. Cristina Kirchner directed José María Olazagasti, the secretary of Minister of Federal Planning Julio De Vido, to attend these meetings.  In the end, the amount agreed upon as compensation for Sidor was approximately one billion, nine hundred million dollars.  Betnaza stated the financial closings happened at the end of 2008 and 2009 with the intervention of Cristina Kirchner.

118.    When asked by the Judge Bonadio to discuss the bribe payments, Betnaza confirmed that between April and December 2008 the Kirchner Government requested Techint make cash contributions to Argentine officials and Betnaza gave specific instructions to Zabaleta on how to make the payments.  Betnaza stated that Zabaleta had the confidence of the Techint Group though at the time he had no executive position because he was retired. Nevertheless, Zabaleta continued carrying out "personal business" for the Company and the shareholders.

119.    Betnaza provided greater detail concerning the Venezuelan government takeover of Sidor and meetings and conversations between Ternium and Argentine government officials as it relates to the bribery scheme in his Testimonial Declaration.  Betnaza gave his Testimonial Declaration (*Declaracion Testimonial*) on August 7, 2018 before the Federal Prosecutor and Authorizing Clerk.  The Testimonial Declaration is made under oath, under penalty of perjury[5].

120.    In his Testimonial Declaration Betnaza testified, in part, as follows:

121.    Pursuant to the agreement concerning the nationalization of Sidor, Ternium was required to hand over Sidor to the Venezuelan government between April and July 2008. Betnaza stated that after Ternium agreed to hand over its stake in Sidor to Venezuela "the situation became even more complicated."  Ternium went to the Argentine government to "ask them to give us a hand, to at least salvage compensation." Argentine government officials, Uberti, De Vido, Olazagasti and Baratta began regularly traveling to Venezuela and in that context began demanding that Ternium make payments of cash to the Argentine government to get them "to deal with Venezuela."

122.    Betnaza then began to make trips to Venezuela to discuss the Venezuelan government's nationalization of Sidor, along with others at Ternium, including Fernando Duelo

---

[5] An original and English translation of Betnaza's Testimonial Declaration is attached hereto and incorporated by reference herein as Exhibit C.

(Ternium's general counsel). They consistently traveled with Olazagasti. On one occasion, President Cristina Fernandez traveled with them to Venezuela and actively participated in chats with President Chavez concerning the takeover of and compensation for Sidor. On that occasion Betnaza suggested that they stay in a different hotel "in order to avoid raising suspicions so that no one would notice that Cristina was interceding between the Venezuelan government and the [C]ompany." During the trip with Cristina Fernandez, Betnaza and the Ternium people stayed at the Hotel Euro Building. The party of Argentine government officials stayed at the Hotel Tamanco, where Betnaza and Cristina Fernandez met to discuss how the meetings with Chavez concerning Sidor had gone. Cristina Fernandez instructed Betnaza to speak with the Venezuelan Finance Minister at the time, Ali Rodriguez. Rodriguez was in charge of making the compensation payments to Ternium in connection with the Venezuelan government takeover of Sidor. Ternium and the Venezuelan Government had agreed that the amount of compensation for Sidor would be one billion, nine hundred seventy million dollars, with four hundred million dollars payable in advance and the rest payable in installments.

123.   Betnaza testified that if Ternium had not paid the bribes to the Argentine government that they demanded, the government would not have interceded on behalf of Ternium in the conflict over Sidor.

124.   Betnaza testified that he did not remember specifically which Argentine government official made the demand for money but that it might have been De Vido, Olazagsti, Baratta or Uberti. The demand for money was made directly to Betnaza.

125.   Betnaza testified that until the situation with Venezuela and Sidor arose Ternium would not assent in the Argentine government's demands for illegal contributions but that when

the conflict with Venezuela arose "they got a commitment from us. The starting point was the conflict in Venezuela, the Achilles heel was Sidor, that is where the pursuit begins."

126. Betnaza testified that he put Zabaleta in charge of dealing with the payments. Zabaleta in turn "met with Baratta and agreed on the mechanism for that."

127. When the Prosecutor asked Betnaza how the money for the bribe payments was generated he stated "I don't know how it was generated, *and how they avoided the company's internal regulations* in order to obtain the money for the payments. [T]he person in charge of this, as I said, was Zabaleta, who managed an account that not only dealt with payments from the company, but with us as partners in the company. He did all of this. I made the decision, but I delegated the task to Zabaleta, who had total operational capacity. Zabaleta did not inform me of the payments. I told him that he had to come to an agreement with these people, and he took care of the issue."

### *The Charges Against Rocca Confirm Rocca's Participation in and Knowledge of the Bribery Scheme*

128. The charges against Rocca came after the (non-public) testimony of Zabaleta and Betnaza. The document charging Rocca with bribery and illicit association was signed by Judge Bonadio on November 27, 2018.[6]

129. The charging document affirms that, at the request of Luis Betnaza, Hector Zabaleta made eight bribe payments to Roberto Baratta between the months of May and December 2008 with Zabaleta providing Baratta bags or packages of money.

130. With respect to Rocca's participation, the charging document states "we can affirm that Paolo Rocca participated together with Luis Maria Cayetano Betnaza in the acts

---

[6] The portion of the charging document that sets forth Rocca's responsibility along an English translation of such portion is attached hereto as Exhibit D.

investigated in the present case, ordering the payments made to Roberto Baratta.  In the first place, it should be noted that due to the position [Rocca] held, he could not be unaware of the existence of payments carried out by the Group to which he belonged."

131.    As evidence of Rocca's knowledge of the bribery, the charging document cites an audio file provided by the Argentine Business Association [AEA] from a conference that took place on August 16, 2018 at the Hotel Sheraton where Rocca explained in great detail the situation that occurred in Venezuela with respect to Sidor, making it impossible that Rocca was unaware of the Argentine government's monetary demands and the corresponding bribe payments.

132.    The charging document also refers to a statement Betnaza made in his defense in which he stated that Claudio Uberti (former head of the Argentine Federal agency that regulates highway concessions ("OCCOVI") and close friend of both Chavez and Kirchner)  made the demand for money to him at a meeting during a February 2007 trip to Venezuela that Nestor Kirchner and Rocca attended, demonstrating that Rocca was present at a meeting where Kircher government officials requested the bribe payments from Betnaza that Ternium eventually made.

133.    The charging document further states "another indication of the accused's liability is provided to us through news articles added to the present proceedings, which show that during the period in which the payments were carried out, [Rocca] was heading negotiations with the Argentine and Venezuelan governments for the SIDOR plants in Venezuela."

134.    As for Rocca's attempt to distance himself from knowledge of and participation of the bribery scheme based on the organization of the different companies in the Techint Group, the charging document states that Rocca's lack of alleged knowledge was not credible, and that

27

he could not hide behind corporate framework: "the accused participated in negotiations for which the payments, attributed in these proceedings, would have been made."

135.    Rocca appealed the charges against him.  On April 15, 2019 the appeals judges agreed to lift the charges, but asked Judge Bonadio to keep the investigation open to establish Rocca's exact role in the bribery scheme.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

136.    Throughout the Class Period, Defendants made materially false and misleading statements about the Company's business as well as its operational and compliance policies and practices.   Specifically, Defendants made false and misleading statements in Ternium's SEC filings and failed to make required disclosures in their Form 20-F SEC filings for fiscal years 2013-2017 as described below:

(a)   Ternium carried out and concealed a bribery scheme to obtain favorable terms in connection with the Venezuelan Government's takeover of Ternium's ownership stake in Sidor;

(b)   Defendants falsely or misleadingly conveyed the terms of the sale of Ternium's interest in Sidor, the payments it received therefrom and the circumstances surrounding the resolution of its dispute with the Venezuelan government related to the nationalization of Sidor;

(c)   Defendants falsely or misleading conveyed that Ternium and its directors, officers and employees complied with its Code of Conduct, Code of Ethics and Policy on Business Conduct which requires them, as a condition for employment to comply with all applicable laws and prohibits "the offering or receiving of bribes or any other form of improper payments;"

(d)   Defendants falsely stated that their internal controls over financial reporting were effective and Defendants Brizzio and Novegil filed Certifications stating that they complied with §302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") when they were aware of, or deliberately reckless in disregarding, that the Company's internal controls over financial reporting were deficient and that their Certifications were false; and

    (e)  Defendants failed to make the appropriate risk disclosures required by Item 3 of Form 20-F.

137.    Defendants knew that discovery of the foregoing misconduct could subject the Company and its executives to criminal and civil liability, endanger the Company's reputation and lead to other regulatory scrutiny and financial risks, but Defendants hid the wrongful conduct nevertheless. As a result of Defendants' false and misleading statements, Ternium's shares traded at artificially inflated prices during the Class Period and members of the Class suffered significant losses and damages once the truth became known.

138.    The statements herein were materially false and misleading when made because they omitted the following true facts, which were known to or recklessly disregarded by Defendants, including:

    (a) the Company's internal controls were so inadequately designed and deficient that employees were able to, and did, engage in an unlawful bribery scheme;

    (b) the Company engaged in an unlawful bribery scheme in 2008 with the Kirchner Government to secure favorable terms in connection with Ternium's transfer of its interest in Sidor to the Venezuelan government;

    (c) Ternium's employees and executives violated the Company's own mandatory Code of Conduct and Code of Ethics and Policy on Business Conduct;

    (d) the Company's criminal and civil liability resulting from its involvement in an unlawful bribery scheme; and

    (e) the reputational risk posed by evidence of an unlawful bribery scheme.

139.    Defendants' false or misleading statements are detailed below.

### *2014 False or Misleading Statements*

140.    On April 30, 2014, after market hours, Ternium filed a Form 20-F for the fiscal year ended December 31, 2013 with the SEC (the "2013 20-F"), which provided the Company's year-end financial results and position. The 2013 20-F was signed by Defendant Brizzio. The

2013 20-F also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Novegil and Brizzio attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

141.   The 2013 20-F provided information concerning Ternium's sale of its 59.7% interest in Sidor to a Venezuelan state-owned entity, stating in relevant part:

> On April 29, 2008, the National Assembly of Venezuela passed a resolution declaring that the shares of Sidor, together with all of its assets, were of public and social interest, and authorizing the Venezuelan government to take any action it deemed appropriate in connection with any such assets, including expropriation. On May 11, 2008, the President of Venezuela issued Decree Law 6058 ordering that Sidor and its subsidiaries and associated companies were transformed into state-owned enterprises ("empresas del Estado"), with Venezuela owning not less than 60% of their share capital. On May 7, 2009, Ternium completed the transfer of its entire 59.7% interest in Sidor to Corporación Venezolana de Guayana, or CVG, a Venezuelan state-owned entity.
>
> \*       \*       \*
>
> ***Ternium's cash flows for 2011 and 2012 include non-recurring payments received in connection with the transfer of our interest in Sidor to Venezuela.*** On May 7, 2009, we completed the transfer of our entire 59.7% interest in Sidor to CVG. Ternium agreed to receive an aggregate amount of USD1.97 billion as compensation for its Sidor shares. Ternium received payments from CVG, including interest, totaling USD953.6 million, USD767.4 million, USD133.1 million and USD136.7 million in 2009, 2010, 2011 and 2012, respectively. With the last payment in October 2012, the pending dispute relating to the nationalization of Sidor was resolved.

142.   The foregoing statement describing Ternium's sale of its interest in Sidor and resolution of its dispute with the Venezuelan government for $1.97 billion was materially false and misleading when made because it omitted to disclose that the sale of its interest in Sidor for $1.97 billion was obtained only through Defendants' undisclosed and illegal bribery scheme.

143.   The 2013 Form 20-F referenced the Company Code of Conduct, stating in relevant part:

We have adopted a code of conduct that applies to all directors, officers and employees, which is posted on our website and complies with the NYSE's requirements, except that it does not require the disclosure of waivers of the code for directors and officers. In addition, we have adopted a supplementary code of ethics for senior financial officers which is also posted on our website.

144.    The 2013 Form 20-F states that the text of Ternium's code of conduct for employees is posted on its web site.  The Code of conduct in effect during the Class Period and at the time Ternium filed its 2013 20-F, as posted on Ternium's website states, in part[7]:

This Code of Conduct defines guidelines and standards of integrity and transparency **which must be complied with by all employees at all levels within Ternium**.

This Code is applied by offices, directors and managers, the Internal Audit Department and the Ternium Audit Committee.

**Agreement to comply with the provisions of this Code is a condition for employment in Ternium**.

Section 5.1 Compliance with the law:  Employees must comply with applicable laws.  **All employees shall in all cases abide by the laws to which Ternium is subject, <u>including the laws in force in the different countries in which Ternium has operations or dealings</u>**.

5.12.  **Commercial Incentives; Bribery Prohibited**.  Commercial incentives must be consistent with applicable laws and market practice and must be approved in accordance with Ternium's procedures.

**Employees should not give anything, for example, money, gifts, travel expenses, excessive entertainment or any other advantage to anyone, that is or could be construed as (1) intending to influence the decision of government officials or political representatives or the performance by them of a relevant function or activity, or (2) a violation of any applicable laws, or regulations…**
**Employees should exercise particular care in dealing with government officials, which should be interpreted widely to include employees or officials of government agencies, government-affiliated entities or government-controlled entities, including government affiliated commercial entities (such as for**

---

[7] Ternium's Second Code of Conduct quoted above was effective from November 5, 2013 through July 2, 2018 whereupon it was replaced by Ternium's third updated version of its Code of Conduct.

*example, State-owned companies), to ensure there can be no suggestion of impropriety.*

**Bribery is Strictly Prohibited.**

*As set forth in Ternium, S.A.'s Policy on Business Conduct, Ternium will not condone, under any circumstances, the offering or receiving of bribes or any other form of improper payments.*

Most countries have laws that make it illegal to engage in bribery, including U.S. Foreign Corrupt Practices Act. The OECD Anti-Bribery Convention establishes legally binding standards to criminalize bribery of foreign public officials in international business transactions. A breach of any of these laws is a serious offence which can result in fines for Ternium and imprisonment for individuals.

145. The foregoing statements were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: (1) Ternium in fact did not require its employees to comply with the Code of Conduct as a condition for employment: (2) Ternium knowingly condoned and engaged in the offering of bribes to government officials in order to secure favorable terms for the sale of its stake in Sidor to the Venezuelan government; (3) Ternium and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure.

146. Ternium's 2013 20-F referenced the Company's Code of Ethics, stating in relevant part:

We have adopted a code of ethics that applies specifically to our principal executive officers, and principal financial and accounting officer and controller, as well as persons performing similar functions. We have also adopted a code of conduct that applies to all company employees, including contractors, subcontractors and suppliers.
The text of our code of ethics for senior financial officers and code of conduct for employees is posted on our web site at: http://www.ternium.com/en/ir/governance.

147. Ternium's Code of Ethics for Senior Financial Officers referred to in Ternium's 2013 20-F states that it is intended to supplement the Company's Code of Conduct and applies to

"its principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions (collectively, the 'Senior Financial Officers')." The Code of Ethics states, in part that Senior Financial Officers will:

> Perform their responsibilities with a view to causing any reports or other documents prepared or reviewed by them, which are intended to be filed with the securities regulators having jurisdiction over the Company, or otherwise made public by the Company, to *contain full, fair, accurate, timely and understandable disclosure*; ***Comply with any governmental laws, rules and regulations applicable to their areas of responsibility; and Report without any delay and possible violation of this Code of Ethics to the Internal Audit Department.***

148.    Ternium's Code of Ethics furthers states:

> Senior Financial Officers will be held accountable for their adherence to this Code of Ethics…The Audit Committee shall approve of any waiver of or amendment to this Code of Ethics. ***Waivers from and amendments to this Code of Ethics will be promptly disclosed in the manner prescribed by securities regulations applicable to the Company….***The Company regards this Code of Ethics as its written code of ethics under Section 406 of the Act, complying with the standards set forth in SEC regulation S-K, Item 406 and Item 16B of Form 20-F.

149.    The foregoing statements that were contained in the Company's 2013 20-F and Ternium's Code of Ethics were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: (1) Ternium's Senior Financial Officers did not comply with "governmental laws, rules and regulations" because Ternium and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure; and (2) none of Ternium's Senior Financial Officers obtained waivers and/or amendments to the Code of Ethics that were disclosed.

150.    In its 2013 20-F Ternium referenced its Policy on Business Conduct Statements stating, in relevant part: "Under NYSE standards, listed companies must adopt and disclose a code of business conduct and ethics for directors, officers and employees, and promptly disclose any waivers of the code for directors or executive officers."  Ternium's Policy on Business

Conduct (which was enacted on July 30, 2013) referenced in its Form 20-F is posted on Ternium's website and provides that the Policy "sets forth principles and procedures designed to ensure that Ternium complies with the requirements of the Ternium Code of Conduct and various national laws prohibiting corruption which, in some cases, also criminalize bribery taking place outside their territories."

151.    Ternium's Policy on Business Conduct states, in relevant part:

*Ternium expects its directors, officers and employees, its subsidiaries' and Associated Persons' directors, officers and employees, and any other person or entity representing the Company or its subsidiaries to conduct themselves properly in all business-related dealings with governmental agencies or entities, companies, or other governmental entities, and their respective officers, employees and other representatives. Ternium will not authorize, participate in, or tolerate any business practice that does not comply with, or violates the intent of this Policy*.

**3.2 Management Responsibilities**

*CEO of Ternium is responsible for ensuring that Ternium and its Controlled Subsidiaries conduct business in accordance with the Policy…the CEO…shall endeavor to foster a strong "culture of compliance" throughout the group.…*The CEO has entrusted to the Chief Financial Officer (CFO) primary responsibility for this Policy as it relates to financial controls and accounting. In keeping with these responsibilities, Ternium will maintain a system of internal controls and make and keep books and records that accurately and fairly reflect transactions.

**4. Compliance with the Law**

As stated in the Ternium Code of Conduct, all persons subject to this Policy shall comply with all applicable laws, regulations and rules.  *This Policy has been designed so that compliance with this Policy will result in compliance with the relevant anti-bribery statutes in the various countries where Ternium or its Controlled Subsidiaries and Associated Persons operate do business or to which it or they may be subject.*
*However, all persons subject to this Policy are required to comply with all local laws in the jurisdictions in which they are conducting business…*

**5. Giving or receiving payment for improper conduct is prohibited**
 *…no person subject to this Policy shall propose, offer, promise, pay or deliver or authorize and other person to propose, offer, promise, pay, or deliver, directly*

*or indirectly, any Thing of Value to any Public Official in order to induce such Public Official to perform or incur in an improper conduct*.

No person subject to this Policy shall request, accept, or agree to accept, directly or indirectly any Thing of Value from any Public Official, for the purpose of performing, directly or through a third party, an improper conduct.

Things of Value should not be offered or provided to a Public Official for the purpose of:

a. Influencing an act of decision by such Public Official (or as consideration therefore);

b. Inducing such Public Official to do or omit to do any act;

c. Inducing such Public Official to use his or her influence to affect or influence, for the benefit of Ternium or any of its Controlled Subsidiaries, any act, decision or resolution; or

d. Securing any other improper advantage;

In each case in order to (i) obtain (whether from such Public Official, his/her employer or any other person or entity) a contract or other business, (ii) direct a contract or other business to any person or entity; (iii) retain business, or (iv) obtain or retain any advantage in the course of business.

*Any such offers, gifts, payments, promises, agreements and authorizations made indirectly through a Public Official are also prohibited*.
…

### 5.1 No Facilitating Payments.

This Policy does not allow "facilitating payments," or payments to Public Officials intended to expedite or secure performance of a routine administrative action from the Public Officials who ordinarily perform such actions.

### 5.2  No Cash Payments

*…no payments for services or goods to any third party shall be made in physical cash* other than documented petty cash disbursements and the permitted payments under the Charitable Contributions Authorization Manual.

### 8.1 Consequence of Failure to Comply

Failure to comply with this Policy will be grounds for termination or other disciplinary action.

152.   The foregoing statements that were contained in the Company's Policy on Business Conduct were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: 1) Ternium authorized the payment of bribes in contravention of the Policy; 2) Ternium's CEO did not foster a culture of compliance with the Policy because he knew about or recklessly disregarded the payment of bribes to government officials; 3) Ternium and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure; 4) Ternium authorized and made multiple cash payments to public officials to secure favorable terms in connection with the sale of its stake in Sidor to the Venezuelan Government.

153.   Item 3.D of Form 20-F requires filers to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk, in a section headed 'Risk Factors.'" The instructions to Item 3.D state: "Risk factors should be concise and explain clearly how the risk affects the issuer or securities."

154.   Ternium's 2013 20-F contained generalized disclosures related to price volatility and risk related to the Company's operations in Latin America as well as specific risks related to "economic and political instability in Argentina" as follows:

> ***Economic and political instability in Argentina, which resulted in a severe recession in 2002, may occur in the future, thereby adversely affecting our business, financial condition and results.***
> Our business and results of operations in Argentina have closely followed macroeconomic conditions. Domestic sales of Siderar were severely affected by Argentina's recession during 2001 and 2002. While the domestic economic recovery over the 2003 – 2008 period led to a recovery of steel shipments to the Argentine domestic market, the downturn in the global economy in the last quarter of 2008 reached the Argentine economy and had a significant adverse impact on our shipments to the Argentine domestic market until their recovery beginning in the second quarter of 2009. More recently, a slowdown in economic activity in Argentina in 2012 resulted in a year-over-year decrease in steel shipments.  The Argentine economy is currently facing significant challenges. Inflation is high, as further discussed below, leading to increasing

labor unrest. In addition, the economy has been affected by supply constraints and capital investment in general has declined significantly due to, among other factors, political, economic and financial uncertainties and government actions, including price and foreign exchange controls, import restrictions, export taxes, an increased level of government intervention in, or limitations to, the conduct of business in the private sector, and other measures affecting investor confidence. For example, in February 2011, the Argentine government imposed controls on the price of steel products sold in Argentina, including products sold by Siderar, and required that sales of steel products be invoiced in Argentine pesos. Although Ternium believes that price controls are illegal under Argentine law and these measures were ultimately revoked, other price controls or similar measures could be imposed in the future. Inflation and declining capital investment may affect growth and, accordingly, cause demand for our local subsidiary's products in the domestic market to drop. Economic conditions in Argentina have deteriorated rapidly in the past and may deteriorate rapidly in the future. The Argentine economy may not continue to grow and economic instability may increase. Our business and results of operations in Argentina could be adversely affected by rapidly changing economic conditions in Argentina or by the Argentine government's policy response to such conditions.

155. Notwithstanding the disclosure requirement set forth in Item 3.D, Ternium's Item 3.D disclosures contained in its 2013 20-F were incomplete and therefore materially misleading because Defendants failed to disclose the following risks, each of which stemmed from Defendants' paying illegal bribes in exchange for favorable terms in connection with the sale of Sidor: (i) the risk that public disclosure of the bribery scheme would result in Ternium's executives facing criminal charges in Argentina; (ii) the risk that public disclosure of the bribery scheme would result in the Company and/or its executives incurring fines and penalties; (iii) the risk that public disclosure of the bribery scheme would result in the Company's criminal and/or civil liability in the United States and other countries in which it does business; and (iv) the risk that public disclosure of the bribery scheme would result in a loss of investor confidence and a corresponding decline in the price of Ternium ADS. Additionally, notwithstanding the litany of risks Ternium detailed related to doing business in Argentina Ternium consciously omitted to disclose the risks related to bribery and corruption providing investors with the false reassurance that such corruption was not a risk to Ternium's business.

37

156.    During the 2008 fiscal year, Ternium's internal control over financial reporting was ineffective because Company funds were used to pay bribes which were not accurately accounted for in the Company's financial statements.  Nevertheless, Ternium's 2008 20-F, filed with the SEC on June 30, 2009 ("2008 20-F") falsely states that "management has concluded that Ternium's internal control over financial reporting, as of December 31, 2008, is effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes."  Likewise, each of the Company's subsequent Forms 20-F's filed prior to the start of the Class Period stated that Ternium's internal control over financial reporting was effective and that "there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

157.    Ternium's 2013 20-F contained SOX certifications signed by Defendants Novegil and Brizzio attesting to the integrity of the Company's internal controls.  The Company's 2013 20-F states that the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes:

**Management's report on internal control over financial reporting**
Management is responsible for establishing and maintaining adequate internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934). Ternium's internal control over financial reporting was designed by management to provide reasonable assurance regarding the reliability of financial reporting and the preparation and fair presentation of its financial statements for external purposes in accordance with IFRS.
Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements or omissions. In addition, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

38

Management conducted its assessment of the effectiveness of Ternium's internal control over financial reporting based on the framework in *Internal Control—Integrated Framework (1992)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

Based on this assessment, management has concluded that Ternium's internal control over financial reporting, as of December 31, 2013, is effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes.

\*\*\*

**Change in Internal Control over Financial Reporting**

During the period covered by this report, there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

158.    Because Ternium's internal control over financial reporting was ineffective in 2008, and because there were no changes to the Company's internal control over financial reporting since 2008, the Company's statement in its 2013 20-F concerning the effectiveness of its internal control over financial reporting is false and misleading.

159.    On April 30, 2014, Defendants Brizzio and Novegil each signed and filed SOX certifications attesting that they were responsible for establishing and maintaining disclosure controls and procedures and internal control over financial reporting and had: (i) designed such internal control to ensure that material information relating to the Company is made known to them timely, (ii) designed such internal control to provide reasonable assurance regarding the reliability of financial reporting and financial statements in accordance with generally accepted accounting principles, (ii) evaluated the internal controls over financial reporting, and disclosed any change in the company's internal control over financial reporting.  They also certified that they had reviewed the 20-F and that it does not contain any untrue statement of a material fact, or omit to state a material fact, necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading.  They further certified that they disclosed

to the Company's auditors and board of directors: (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting; and (b) any fraud, whether or not material, that involves management.

160. Brizzio's and Novegil's certifications were false and misleading because Brizzio and Novegil were aware that: a) Ternium's internal control over financial reporting was not properly designed, was deficient, had material weaknesses, and had been circumvented by management to carry out a bribery scheme with corrupt Argentine and Venezuelan officials to secure a higher price for the sale of Ternium's interest in Sidor and b) they had not disclosed the material fraud involving Ternium's bribery scheme which subjected the Company and its executives to criminal and civil liability and reputational damage.

### *2015 False or Misleading Statements*

161. On June 1, 2015 Ternium filed a Form 20-F for the fiscal year ended December 31, 2014 with the SEC (the "2014 20-F"), which provided the Company's year-end financial results and position. The 2014 20-F was signed by Defendant Brizzio. The 2014 20-F also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Novegil and Brizzio attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

162. The 2014 20-F provided information concerning Ternium's sale of its 59.7% interest in Sidor to a Venezuelan state-owned entity, stating in relevant part:

> On April 29, 2008, the National Assembly of Venezuela passed a resolution declaring that the shares of Sidor, together with all of its assets, were of public and social interest, and authorizing the Venezuelan government to take any action it deemed appropriate in connection with any such assets, including expropriation.

On May 11, 2008, the President of Venezuela issued Decree Law 6058 ordering that Sidor and its subsidiaries and associated companies were transformed into state-owned enterprises ("empresas del Estado"), with Venezuela owning not less than 60% of their share capital. On May 7, 2009, Ternium completed the transfer of its entire 59.7% interest in Sidor to Corporación Venezolana de Guayana, or CVG, a Venezuelan state-owned entity.

*     *     *

***Ternium's cash flows for 2011 and 2012 include non-recurring payments received in connection with the transfer of our interest in Sidor to Venezuela.*** On May 7, 2009, we completed the transfer of our entire 59.7% interest in Sidor to CVG. Ternium agreed to receive an aggregate amount of USD1.97 billion as compensation for its Sidor shares. Ternium received payments from CVG, including interest, totaling USD953.6 million, USD767.4 million, USD133.1 million and USD136.7 million in 2009, 2010, 2011 and 2012, respectively. With the last payment in October 2012, the pending dispute relating to the nationalization of Sidor was resolved.

163.    The foregoing statement describing Ternium's sale of its interest in Sidor and resolution of its dispute with the Venezuelan government for $1.97 billion was materially false and misleading when issued because it omitted to disclose that the sale of its interest in Sidor for $1.97 billion was obtained only through Defendants' undisclosed and illegal bribery scheme.

164.    The 2014 Form 20-F referenced the Company Code of Conduct, stating in relevant part:

We have adopted a code of conduct that applies to all directors, officers and employees, which is posted on our website and complies with the NYSE's requirements, except that it does not require the disclosure of waivers of the code for directors and officers. In addition, we have adopted a supplementary code of ethics for senior financial officers which is also posted on our website.

165.    The 2014 Form 20-F states that the text of Ternium's code of conduct for employees is posted on its web site.  The Code of conduct in effect during the Class Period and at the time Ternium filed its 2014 20-F, as posted on Ternium's website states, in part:

This Code of Conduct defines guidelines and standards of integrity and transparency **which must be complied with by all employees at all levels within Ternium**.

This Code is applied by offices, directors and managers, the Internal Audit Department and the Ternium Audit Committee.

***Agreement to comply with the provisions of this Code is a condition for employment in Ternium***.

Section 5.1 Compliance with the law:  Employees must comply with applicable laws.  ***All employees shall in all cases abide by the laws to which Ternium is subject, <u>including the laws in force in the different countries in which Ternium has operations or dealings</u>***.

5.12.  ***Commercial Incentives; Bribery Prohibited***.  Commercial incentives must be consistent with applicable laws and market practice and must be approved in accordance with Ternium's procedures.

***Employees should not give anything, for example, money, gifts, travel expenses, excessive entertainment or any other advantage to anyone, that is or could be construed as (1) intending to influence the decision of government officials or political representatives or the performance by them of a relevant function or activity, or (2) a violation of any applicable laws, or regulations…***
***Employees should exercise particular care in dealing with government officials, which should be interpreted widely to include employees or officials of government agencies, government-affiliated entities or government-controlled entities, including government affiliated commercial entities (such as for example, State-owned companies), to ensure there can be no suggestion of impropriety.***

**<u>Bribery is Strictly Prohibited.</u>**

***<u>As set forth in Ternium, S.A.'s Policy on Business Conduct, Ternium will not condone, under any circumstances, the offering or receiving of bribes or any other form of improper payments</u>***.

Most countries have laws that make it illegal to engage in bribery, including U.S. Foreign Corrupt Practices Act.  The OECD Anti-Bribery Convention establishes legally binding standards to criminalize bribery of foreign public officials in international business transactions.  A breach of any of these laws is a serious offence which can result in fines for Ternium and imprisonment for individuals.

166.    The foregoing statements were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: (1) Ternium in fact did not require its employees to comply with the Code of Conduct as a condition for

employment: (2) Ternium knowingly condoned and engaged in the offering of bribes to government officials in order to secure favorable terms for the sale of its stake in Sidor to the Venezuelan government; (3) Ternium and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure.

167.    Ternium's 2014 20-F referenced the Company's Code of Ethics, stating in relevant part:

> We have adopted a code of ethics that applies specifically to our principal executive officers, and principal financial and accounting officer and controller, as well as persons performing similar functions. We have also adopted a code of conduct that applies to all company employees, including contractors, subcontractors and suppliers.
> The text of our code of ethics for senior financial officers and code of conduct for employees is posted on our web site at: http://www.ternium.com/en/ir/governance.

168.    Ternium's Code of Ethics for Senior Financial Officers referred to in its 2014 20-F states that it is intended to supplement the Company's Code of Conduct and applies to "its principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions (collectively, the 'Senior Financial Officers')." The Code of Ethics states, in part that Senior Financial Officers will:

> Perform their responsibilities with a view to causing any reports or other documents prepared or reviewed by them, which are intended to be filed with the securities regulators having jurisdiction over the Company, or otherwise made public by the Company, to *contain full, fair, accurate, timely and understandable disclosure*; **Comply with any governmental laws, rules and regulations applicable to their areas of responsibility; and Report without any delay and possible violation of this Code of Ethics to the Internal Audit Department.**

169.    Ternium's Code of Ethics furthers states:

> Senior Financial Officers will be held accountable for their adherence to this Code of Ethics…The Audit Committee shall approve of any waiver of or amendment to this Code of Ethics. **Waivers from and amendments to this Code of Ethics will be promptly disclosed in the manner prescribed by securities regulations applicable to the**

*Company*….The Company regards this Code of Ethics as its written code of ethics under Section 406 of the Act, complying with the standards set forth in SEC regulation S-K, Item 406 and Item 16B of Form 20-F.

170.    The foregoing statements that were contained in the Company's 2014 20-F and Ternium's Code of Ethics were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: (1) Ternium's Senior Financial Officers did not comply with "governmental laws, rules and regulations" because Ternium and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure; and (2) none of Ternium's Senior Financial Officers obtained waivers and/or amendments to the Code of Ethics that were disclosed.

171.    In its 2014 20-F Ternium referenced its Policy on Business Conduct Statements stating, in relevant part: "Under NYSE standards, listed companies must adopt and disclose a code of business conduct and ethics for directors, officers and employees, and promptly disclose any waivers of the code for directors or executive officers."  Ternium's Policy on Business Conduct referenced in its Form 20-F is posted on Ternium's website and provides that the Policy "sets forth principles and procedures designed to ensure that Ternium complies with the requirements of the Ternium Code of Conduct and various national laws prohibiting corruption which, in some cases, also criminalize bribery taking place outside their territories."

172.    Ternium's Policy on Business Conduct states, in relevant part:

*Ternium expects its directors, officers and employees, its subsidiaries' and Associated Persons' directors, officers and employees, and any other person or entity representing the Company or its subsidiaries to conduct themselves properly in all business-related dealings with governmental agencies or entities, companies, or other governmental entities, and their respective officers, employees and other representatives. Ternium will not authorize, participate in, or tolerate any business practice that does not comply with, or violates the intent of this Policy*.

**3.2 Management Responsibilities**

44

*CEO of Ternium is responsible for ensuring that Ternium and its Controlled Subsidiaries conduct business in accordance with the Policy…the CEO…shall endeavor to foster a strong "culture of compliance" throughout the group.…*The CEO has entrusted to the Chief Financial Officer (CFO) primary responsibility for this Policy as it relates to financial controls and accounting. In keeping with these responsibilities, Ternium will maintain a system of internal controls and make and keep books and records that accurately and fairly reflect transactions.

## 4. Compliance with the Law

As stated in the Ternium Code of Conduct, all persons subject to this Policy shall comply with all applicable laws, regulations and rules. *This Policy has been designed so that compliance with this Policy will result in compliance with the relevant anti-bribery statutes in the various countries where Ternium or its Controlled Subsidiaries and Associated Persons operate do business or to which it or they may be subject.*
*However, all persons subject to this Policy are required to comply with all local laws in the jurisdictions in which they are conducting business…*

## 5. Giving or receiving payment for improper conduct is prohibited

*…no person subject to this Policy shall propose, offer, promise, pay or deliver or authorize and other person to propose, offer, promise, pay, or deliver, directly or indirectly, any Thing of Value to any Public Official in order to induce such Public Official to perform or incur in an improper conduct*.

No person subject to this Policy shall request, accept, or agree to accept, directly or indirectly any Thing of Value from any Public Official, for the purpose of performing, directly or through a third party, an improper conduct.

Things of Value should not be offered or provided to a Public Official for the purpose of:

e.  Influencing an act of decision by such Public Official (or as consideration therefore);

f.  Inducing such Public Official to do or omit to do any act;

g.  Inducing such Public Official to use his or her influence to affect or influence, for the benefit of Ternium or any of its Controlled Subsidiaries, any act, decision or resolution; or

h.  Securing any other improper advantage;

In each case in order to (i) obtain (whether from such Public Official, his/her employer or any other person or entity) a contract or other business, (ii) direct a

contract or other business to any person or entity; (iii) retain business, or (iv) obtain or retain any advantage in the course of business.

*Any such offers, gifts, payments, promises, agreements and authorizations made indirectly through a Public Official are also prohibited.*
…

**5.1 No Facilitating Payments.**

This Policy does not allow "facilitating payments," or payments to Public Officials intended to expedite or secure performance of a routine administrative action from the Public Officials who ordinarily perform such actions.

5.2 **No Cash Payments**

*…no payments for services or goods to any third party shall be made in physical cash* other than documented petty cash disbursements and the permitted payments under the Charitable Contributions Authorization Manual.

**8.1 Consequence of Failure to Comply**

Failure to comply with this Policy will be grounds for termination or other disciplinary action.

173.    The foregoing statements that were contained in the Company's Policy on Business Conduct were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: 1) Ternium authorized the payment of bribes in contravention of the Policy; 2) Ternium's CEO did not foster a culture of compliance with the Policy because he knew about or recklessly disregarded the payment of bribes to government officials; 3) Ternium and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure; 4) Ternium permitted multiple cash payments to public officials to secure favorable terms in connection with the sale of its stake in Sidor to the Venezuelan Government.

174.    Item 3.D of Form 20-F requires filers to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk, in a

section headed 'Risk Factors.'" The instructions to Item 3.D state: "Risk factors should be concise and explain clearly how the risk affects the issuer or securities."

175. Ternium's 2014 20-F contained generalized disclosures related to price volatility and risk related to the Company's operations in Latin America as well as specific risks related to "economic and political instability in Argentina" as follows:

> ***Economic and political instability in Argentina, which resulted in a severe recession in 2002, may occur in the future, thereby adversely affecting our business, financial condition and results.***
> Our business and results of operations in Argentina have closely followed macroeconomic conditions. Domestic sales of Siderar were severely affected by Argentina's recession during 2001 and 2002. While the domestic economic recovery over the 2003 – 2008 period led to a recovery of steel shipments to the Argentine domestic market, the downturn in the global economy in the last quarter of 2008 reached the Argentine economy and had a significant adverse impact on our shipments to the Argentine domestic market until their recovery beginning in the second quarter of 2009. More recently, a slowdown in economic activity in Argentina in 2012 resulted in a year-over-year decrease in steel shipments. The Argentine economy is currently facing significant challenges. Inflation is high, as further discussed below, leading to increasing labor unrest. In addition, the economy has been affected by supply constraints and capital investment in general has declined significantly due to, among other factors, political, economic and financial uncertainties and government actions, including price and foreign exchange controls, import restrictions, export taxes, an increased level of government intervention in, or limitations to, the conduct of business in the private sector, and other measures affecting investor confidence. For example, in February 2011, the Argentine government imposed controls on the price of steel products sold in Argentina, including products sold by Siderar, and required that sales of steel products be invoiced in Argentine pesos. Although Ternium believes that price controls are illegal under Argentine law and these measures were ultimately revoked, other price controls or similar measures could be imposed in the future. Inflation and declining capital investment may affect growth and, accordingly, cause demand for our local subsidiary's products in the domestic market to drop. Economic conditions in Argentina have deteriorated rapidly in the past and may deteriorate rapidly in the future. The Argentine economy may not continue to grow and economic instability may increase. Our business and results of operations in Argentina could be adversely affected by rapidly changing economic conditions in Argentina or by the Argentine government's policy response to such conditions.

176.    Notwithstanding the disclosure requirement set forth in Item 3.D, Ternium's Item 3.D disclosures contained in its 2014 20-F were incomplete and therefore materially misleading because Defendants failed to disclose the following risks, each of which stemmed from Defendants' paying illegal bribes in exchange for favorable terms in connection with the sale of Sidor:  (i) the risk that public disclosure of the bribery scheme would result in Ternium's executives facing criminal charges in Argentina; (ii) the risk that public disclosure of the bribery scheme would result in the Company and/or its executives incurring fines and penalties; (iii) the risk that public disclosure of the bribery scheme would result in the Company's criminal and/or civil liability in the United States and other countries in which it does business; and (iv) the risk that public disclosure of the bribery scheme would result in a loss of investor confidence and a corresponding decline in the price of Ternium ADS. Additionally, notwithstanding the litany of risks Ternium detailed related to doing business in Argentina Ternium consciously omitted to disclose the risks related to bribery and corruption providing investors with the false reassurance that such corruption was not a risk to Ternium's business.

177.    During the 2008 fiscal year, Ternium's internal control over financial reporting was ineffective because Company funds were used to pay bribes which were not accurately accounted for in the Company's financial statements.  Nevertheless, Ternium's 2008 20-F, filed with the SEC on June 30, 2009 ("2008 20-F") falsely states that "management has concluded that Ternium's internal control over financial reporting, as of December 31, 2008, is effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes."  Likewise, each of the Company's subsequent Forms 20-F's filed prior to the start of the Class Period stated that Ternium's internal control over financial reporting was effective and that "there were no changes in our internal control

over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

178.    Ternium's 2014 20-F states that the Company did not maintain effective internal control over financial reporting solely because of a control deficiency related to monitoring indicators of value for the Company's equity investments:

**Management's report on internal control over financial reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934). Ternium's internal control over financial reporting was designed by management to provide reasonable assurance regarding the reliability of financial reporting and the preparation and fair presentation of its financial statements for external purposes in accordance with IFRS. … Management conducted its assessment of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control—Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) as of December 31, 2014. Our management has concluded that the Company's controls for evaluating and monitoring relevant indicators of value for its equity investments, such as the prices of comparable arm's length transactions did not operate effectively. This control deficiency resulted in the restatement of the Company's consolidated financial statements for the quarter ended September 30, 2014 and the year ended December 31, 2014. Accordingly, our management has determined that this control deficiency constitutes a material weakness. … . Accordingly, if not remediated, this deficiency could result in misstatements of equity investments that could, in turn, result in material misstatements of the Company's consolidated financial statements that would not be timely prevented or detected. Because of this material weakness, management concluded that the Company did not maintain effective internal control over financial reporting as of December 31, 2014, based on criteria in Internal Control—Integrated Framework issued by the COSO.

***

**Remediation Plan**
The Company will reinforce its monitoring of other potentially relevant indicators of value for its equity investments. These indicators may include but are not limited to the book value of such assets determined by others under IFRS, and the price of comparable arm's length transactions. In addition, the Company will

provide additional training to personnel to better assess and evaluate the recoverability of its equity investments. Management believes that the foregoing efforts will effectively remediate the material weakness.

179.     Because Ternium's internal control over financial reporting was ineffective in 2008, and because the only material weakness Ternium identified in its 2014 20-F related to monitoring indicators of value for the Company's equity investments, the Company's statement in its 2014 20-F concerning its internal control over financial reporting is false and misleadingly incomplete because Ternium's internal control over financial reporting did not operate effectively insofar as it failed to detect and/or prevent illegal bribery payments from being made.

180.     On June 1 2015, Defendants Brizzio and Novegil each signed and filed SOX certifications attesting that they were responsible for establishing and maintaining disclosure controls and procedures and internal control over financial reporting and had: (i) designed such internal control to ensure that material information relating to the Company is made known to them timely, (ii) designed such internal control to provide reasonable assurance regarding the reliability of financial reporting and financial statements in accordance with generally accepted accounting principles, (ii) evaluated the internal controls over financial reporting, and disclosed any change in the company's internal control over financial reporting.  They also certified that they had reviewed the 20-F and that it does not contain any untrue statement of a material fact, or omit to state a material fact necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading.  They further certified that they disclosed to the Company's auditors and board of directors (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting; and (b) any fraud whether or not material that involves management.

181.    Brizzio's and Novegil's certifications were false and misleading because Brizzio and Novegil were aware that: a) Ternium's internal control over financial reporting was not properly designed, was deficient, had material weaknesses, and had been circumvented by management to carry out a bribery scheme with corrupt Argentine and Venezuelan officials to secure a higher price for the sale of Ternium's interest in Sidor and b) they had not disclosed the material fraud involving Ternium's bribery scheme which subjected the Company and its executives to criminal and civil liability and reputational damage.

### *2016 False or Misleading Statements*

182.    On April 29, 2016, Ternium filed a Form 20-F for the fiscal year ended December 31, 2015 with the SEC (the "2015 20-F"), which provided the Company's year-end financial results and position. The 2015 20-F was signed by Defendant Brizzio. The 2015 20-F contained signed SOX certifications by Defendants Novegil and Brizzio attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

183.    The 2015 20-F provided information concerning Ternium's sale of its 59.7% interest in Sidor to a Venezuelan state-owned entity, stating in relevant part:

> On April 29, 2008, the National Assembly of Venezuela passed a resolution declaring that the shares of Sidor, together with all of its assets, were of public and social interest, and authorizing the Venezuelan government to take any action it deemed appropriate in connection with any such assets, including expropriation. On May 11, 2008, the President of Venezuela issued Decree Law 6058 ordering that Sidor and its subsidiaries and associated companies were transformed into state-owned enterprises (*"empresas del Estado"*), with Venezuela owning not less than 60% of their share capital. On May 7, 2009, Ternium completed the transfer of its entire 59.7% interest in Sidor to Corporación Venezolana de Guayana, or CVG, a Venezuelan state-owned entity.

184.    The foregoing statement describing Ternium's completion of the transfer of its interest in Sidor to CVG and sale of its interest in Sidor was materially false and misleading

when issued because it omitted to disclose that the transfer was facilitated through Defendants'

undisclosed and illegal bribery scheme.

185.   The 2015 Form 20-F referenced the Company Code of Conduct, stating in

relevant part:

> We have adopted a code of conduct that applies to all directors, officers and
> employees, which is posted on our website and complies with the NYSE's
> requirements, except that it does not require the disclosure of waivers of the code
> for directors and officers. In addition, we have adopted a supplementary code of
> ethics for senior financial officers which is also posted on our website.

186.   The 2015 Form 20-F states that the text of Ternium's code of conduct for

employees is posted on its web site.  The Code of conduct in effect during the Class Period and

at the time Ternium filed its 2015 20-F, as posted on Ternium's website states, in part:

>  This Code of Conduct defines guidelines and standards of integrity and
> transparency **which must be complied with by all employees at all levels within
> Ternium**.

> This Code is applied by offices, directors and managers, the Internal Audit
> Department and the Ternium Audit Committee.

> **Agreement to comply with the provisions of this Code is a condition for
> employment in Ternium**.

> Section 5.1 Compliance with the law:  Employees must comply with applicable
> laws.  **All employees shall in all cases abide by the laws to which Ternium is
> subject, <u>including the laws in force in the different countries in which Ternium
> has operations or dealings</u>.**

> 5.12.  **Commercial Incentives; Bribery Prohibited**.  Commercial incentives must
> be consistent with applicable laws and market practice and must be approved in
> accordance with Ternium's procedures.

> **Employees should not give anything, for example, money, gifts, travel expenses,
> excessive entertainment or any other advantage to anyone, that is or could be
> construed as (1) intending to influence the decision of government officials or
> political representatives or the performance by them of a relevant function or
> activity, or (2) a violation of any applicable laws, or regulations…**

> *Employees should exercise particular care in dealing with government officials, which should be interpreted widely to include employees or officials of government agencies, government-affiliated entities or government-controlled entities, including government affiliated commercial entities (such as for example, State-owned companies), to ensure there can be no suggestion of impropriety.*

> **Bribery is Strictly Prohibited.**

> <u>**As set forth in Ternium, S.A.'s Policy on Business Conduct, Ternium will not condone, under any circumstances, the offering or receiving of bribes or any other form of improper payments**</u>.

> Most countries have laws that make it illegal to engage in bribery, including U.S. Foreign Corrupt Practices Act. The OECD Anti-Bribery Convention establishes legally binding standards to criminalize bribery of foreign public officials in international business transactions. A breach of any of these laws is a serious offence which can result in fines for Ternium and imprisonment for individuals.

187. The foregoing statements were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: (1) Ternium in fact did not require its employees to comply with the Code of Conduct as a condition for employment; (2) Ternium knowingly condoned and engaged in the offering of bribes to government officials in order to secure favorable terms for the sale of its stake in Sidor to the Venezuelan government; (3) Ternium and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure.

188. Ternium's 2015 20-F referenced the Company's Code of Ethics, stating in relevant part:

> We have adopted a code of ethics that applies specifically to our principal executive officers, and principal financial and accounting officer and controller, as well as persons performing similar functions. We have also adopted a code of conduct that applies to all company employees, including contractors, subcontractors and suppliers.
> The text of our code of ethics for senior financial officers and code of conduct for employees is posted on our web site at: http://www.ternium.com/en/ir/governance.

189. Ternium's Code of Ethics for Senior Financial Officers Ternium referred to in its 2015 20-F states that it is intended to supplement the Company's Code of Conduct and applies to "its principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions (collectively, the 'Senior Financial Officers')." The Code of Ethics states, in part that Senior Financial Officers will:

> Perform their responsibilities with a view to causing any reports or other documents prepared or reviewed by them, which are intended to be filed with the securities regulators having jurisdiction over the Company, or otherwise made public by the Company, to *contain full, fair, accurate, timely and understandable disclosure*; **Comply with any governmental laws, rules and regulations applicable to their areas of responsibility; and Report without any delay and possible violation of this Code of Ethics to the Internal Audit Department.**

190. Ternium's Code of Ethics furthers states:

> Senior Financial Officers will be held accountable for their adherence to this Code of Ethics…The Audit Committee shall approve of any waiver of or amendment to this Code of Ethics. ***Waivers from and amendments to this Code of Ethics will be promptly disclosed in the manner prescribed by securities regulations applicable to the Company….***The Company regards this Code of Ethics as its written code of ethics under Section 406 of the Act, complying with the standards set forth in SEC regulation S-K, Item 406 and Item 16B of Form 20-F.

191. The foregoing statements that were contained in the Company's 2015 20-F and Ternium's Code of Ethics were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: (1) Ternium's Senior Financial Officers did not comply with "governmental laws, rules and regulations" because Ternium and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure; and (2) none of Ternium's Senior Financial Officers obtained waivers and/or amendments to the Code of Ethics that were disclosed.

192. In its 2015 20-F Ternium referenced its Policy on Business Conduct Statements stating, in relevant part: "Under NYSE standards, listed companies must adopt and disclose a

code of business conduct and ethics for directors, officers and employees, and promptly disclose any waivers of the code for directors or executive officers." Ternium's Policy on Business Conduct referenced in its Form 20-F is posted on Ternium's website and provides that the Policy "sets forth principles and procedures designed to ensure that Ternium complies with the requirements of the Ternium Code of Conduct and various national laws prohibiting corruption which, in some cases, also criminalize bribery taking place outside their territories."

193. Ternium's Policy on Business Conduct states, in relevant part:

*Ternium expects its directors, officers and employees, its subsidiaries' and Associated Persons' directors, officers and employees, and any other person or entity representing the Company or its subsidiaries to conduct themselves properly in all business-related dealings with governmental agencies or entities, companies, or other governmental entities, and their respective officers, employees and other representatives. Ternium will not authorize, participate in, or tolerate any business practice that does not comply with, or violates the intent of this Policy.*

### 3.2 Management Responsibilities

*CEO of Ternium is responsible for ensuring that Ternium and its Controlled Subsidiaries conduct business in accordance with the Policy…the CEO…shall endeavor to foster a strong "culture of compliance" throughout the group.…*The CEO has entrusted to the Chief Financial Officer (CFO) primary responsibility for this Policy as it relates to financial controls and accounting. In keeping with these responsibilities, Ternium will maintain a system of internal controls and make and keep books and records that accurately and fairly reflect transactions.

### 4. Compliance with the Law

As stated in the Ternium Code of Conduct, all persons subject to this Policy shall comply with all applicable laws, regulations and rules. *This Policy has been designed so that compliance with this Policy will result in compliance with the relevant anti-bribery statutes in the various countries where Ternium or its Controlled Subsidiaries and Associated Persons operate do business or to which it or they may be subject.*
*However, all persons subject to this Policy are required to comply with all local laws in the jurisdictions in which they are conducting business…*

### 5. Giving or receiving payment for improper conduct is prohibited

*…**no person subject to this Policy shall propose, offer, promise, pay or deliver or authorize any other person to propose, offer, promise, pay, or deliver, directly or indirectly, any Thing of Value to any Public Official in order to induce such Public Official to perform or incur in an improper conduct**.*

No person subject to this Policy shall request, accept, or agree to accept, directly or indirectly any Thing of Value from any Public Official, for the purpose of performing, directly or through a third party, an improper conduct.

Things of Value should not be offered or provided to a Public Official for the purpose of:

i.  Influencing an act of decision by such Public Official (or as consideration therefore);

j.  Inducing such Public Official to do or omit to do any act;

k.  Inducing such Public Official to use his or her influence to affect or influence, for the benefit of Ternium or any of its Controlled Subsidiaries, any act, decision or resolution; or

l.  Securing any other improper advantage;

In each case in order to (i) obtain (whether from such Public Official, his/her employer or any other person or entity) a contract or other business, (ii) direct a contract or other business to any person or entity; (iii) retain business, or (iv) obtain or retain any advantage in the course of business.

***Any such offers, gifts, payments, promises, agreements and authorizations made indirectly through a Public Official are also prohibited***.
…

**5.1 No Facilitating Payments.**

This Policy does not allow "facilitating payments," or payments to Public Officials intended to expedite or secure performance of a routine administrative action from the Public Officials who ordinarily perform such actions.

5.2  **No Cash Payments**

***…no payments for services or goods to any third party shall be made in physical cash*** other than documented petty cash disbursements and the permitted payments under the Charitable Contributions Authorization Manual.

**8.1 Consequence of Failure to Comply**

Failure to comply with this Policy will be grounds for termination or other disciplinary action.

194.     The foregoing statements that were contained in the Company's Policy on Business Conduct were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: 1) Ternium authorized the payment of bribes in contravention of the Policy; 2) Ternium's CEO did not foster a culture of compliance with the Policy because he knew about or recklessly disregarded the payment of bribes to government officials; 3) Ternium and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure; 4) Ternium authorized and made multiple cash payments to public officials to secure favorable terms in connection with the sale of its stake in Sidor to the Venezuelan Government.

195.     Item 3.D of Form 20-F requires filers to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk, in a section headed 'Risk Factors.'"   The instructions to Item 3.D state: "Risk factors should be concise and explain clearly how the risk affects the issuer or securities."

196.     Ternium's 2015 20-F contained generalized disclosures related to price volatility and risk related to the Company's operations in Latin America as well as specific risks related to "economic and political instability in Argentina" as follows:

> ***Economic and political instability in Argentina, which on several occasions resulted in economic uncertainties and recession, may occur in the future,***
> ***thereby adversely affecting our business, financial condition and results.***
> Our business and results of operations in Argentina depend on macroeconomic conditions, among other factors. Steel shipments to the Argentine domestic market were disrupted during the 2008-2009 downturn in the global economy. Steel shipments to the Argentine domestic market also decreased in 2016, as the country faced a significant rebalancing of the economy's relative prices in a year of macroeconomic policy changes under a new administration. The Argentine economy is currently facing significant

challenges. As further discussed below, high inflation is leading to labor unrest. In addition, in the last decade, the economy was affected by supply constraints and capital investment in general has declined significantly due to, among other factors, political, economic and financial uncertainties and government actions adopted by previous administrations, which included price and foreign exchange controls, import restrictions, export taxes, an increased level of government intervention in, or limitations to, the conduct of business in the private sector and other measures affecting investor confidence. Although the current administration removed such measures, there can be no assurance that they will not be reestablished in the future or that the Argentine government will not take additional similar measures in the future. Economic conditions in Argentina have deteriorated rapidly in the past and may deteriorate rapidly in the future. The Argentine economy may not grow and economic instability may increase. Our business and results of operations in Argentina could be adversely affected by rapidly changing economic conditions in Argentina or by the Argentine government's policy response to such conditions.

197. Notwithstanding the disclosure requirement set forth in Item 3.D, Ternium's Item 3.D disclosures contained in its 2015 20-F were incomplete and therefore materially misleading because Defendants failed to disclose the following risks, each of which stemmed from Defendants' paying illegal bribes in exchange for favorable terms in connection with the sale of Sidor: (i) the risk that public disclosure of the bribery scheme would result in Ternium's executives facing criminal charges in Argentina; (ii) the risk that public disclosure of the bribery scheme would result in the Company and/or its executives incurring fines and penalties; (iii) the risk that public disclosure of the bribery scheme would result in the Company's criminal and/or civil liability in the United States and other countries in which it does business; and (iv) the risk that public disclosure of the bribery scheme would result in a loss of investor confidence and a corresponding decline in the price of Ternium ADS. Additionally, notwithstanding the litany of risks Ternium detailed related to doing business in Argentina Ternium consciously omitted to discuss the risks related to bribery and corruption providing investors with the false reassurance that such corruption was not a risk to Ternium's business.

198.    During the 2008 fiscal year, Ternium's internal control over financial reporting was ineffective because Company funds were used to pay bribes which were not accurately accounted for in the Company's financial statements.  Nevertheless, Ternium's 2008 20-F, filed with the SEC on June 30, 2009 ("2008 20-F") falsely states that "management has concluded that Ternium's internal control over financial reporting, as of December 31, 2008, is effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes."  Likewise, the Company's 2009, 2010, 2011, 2012 and 2013 20-F's each stated that Ternium's internal control over financial reporting was effective and that "there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."  The Company's 2014 20-F stated that the Company's internal control over financial reporting was ineffective solely because of a control deficiency related to monitoring indicators of value for the Company's equity investments.

199.    Ternium's 2015 20-F contained SOX certifications signed by Defendants Novegil and Brizzio attesting to the integrity of the Company's internal controls.  The Company's 2015 20-F states that the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes and that aside from the remedial measure related to monitoring indicators of value for equity investments, there were no changes in Ternium's internal control over financial reporting:

**Management's report on internal control over financial reporting**

control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934). Ternium's internal control

59

over financial reporting was designed by management to provide reasonable assurance regarding the reliability of financial reporting and the preparation and fair presentation of its financial statements for external purposes in accordance with IFRS.

…Management conducted its assessment of the effectiveness of Ternium's internal control over financial reporting based on the framework in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on this assessment, management has concluded that Ternium's internal control over financial reporting, as of December 31, 2015, is effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes.

\*\*\*

### Change in Internal Control over Financial Reporting

In our annual report on Form 20-F for the year ended December 31, 2014, our management reported the following material weakness in our internal control over financial reporting: The Company's controls for evaluating and monitoring relevant indicators of value for its equity investments, such as the prices of comparable arm's length transactions, did not operate effectively. This control deficiency resulted in the restatement of the Company's consolidated financial statements for the quarter ended September 30, 2014, and the year ended December 31, 2014. Accordingly, our management determined that this control deficiency constituted a material weakness. Because of this material weakness, management concluded that the Company did not maintain effective internal control over financial reporting as of December 31, 2014, based on criteria in Internal Control—Integrated Framework issued by the COSO.

In 2015, we implemented and executed remedial measures to address the material weakness described above, including the following:
• Reinforcing the monitoring of other potentially relevant indicators of value for its equity investments, such as the book value of such assets
determined by others under IFRS, and the price of comparable arm's length transactions.
• Providing additional training to personnel to better asses [*sic*] and evaluate the recoverability of its equity investments.
We have concluded that the material weakness described in our annual report on Form 20-F for the year ended December 31, 2014, has been remediated. Other than the remedial measures described above, there were no other significant changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the year ended December 31, 2015, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

200.    Because Ternium's internal control over financial reporting was ineffective in 2008, and because there were no changes to the Company's internal control over financial reporting since 2008 that remedied the fact the Company's internal control over financial reporting was  ineffective because Company funds were used to pay bribes which were not accurately accounted for in the Company's financial statements, the Company's statement in its 2015 20-F concerning the effectiveness of its internal control over financial reporting is false and misleading.

201.    On April 29, 2016, Defendants Brizzio and Novegil each signed and filed SOX certifications attesting that they were responsible for establishing and maintaining disclosure controls and procedures and internal control over financial reporting and had: (i) designed such internal control to ensure that material information relating to the Company is made known to them timely, (ii) designed such internal control to provide reasonable assurance regarding the reliability of financial reporting and financial statements in accordance with generally accepted accounting principles, (ii) evaluated the internal controls over financial reporting, and disclosed any change in the company's internal control over financial reporting.  They also certified that they had reviewed the 20-F and that it does not contain any untrue statement of a material fact, or omit to state a material fact necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading.  They further certified that they disclosed to the Company's auditors and board of directors (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting; and (b) any fraud whether or not material that involves management.

202.    Brizzio's and Novegil's certifications were false and misleading because Brizzio and Novegil were aware that: a) Ternium's internal control over financial reporting was not

properly designed, was deficient, had material weaknesses, and had been circumvented by management to carry out a bribery scheme with corrupt Argentine and Venezuelan officials to secure a higher price for the sale of Ternium's interest in Sidor and b) they had not disclosed the material fraud involving Ternium's bribery scheme which subjected the Company and its executives to criminal and civil liability and reputational damage.

### *2017 False or Misleading Statements*

203.     On May 1, 2017, Ternium filed a Form 20-F for the fiscal year ended December 31, 2016 with the SEC (the "2016 20-F"), which provided the Company's year-end financial results and position. The 2016 20-F was signed by Defendant Brizzio. The 2016 20-F contained signed SOX certifications by Defendants Novegil and Brizzio attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

204.     The 2016 20-F provided information concerning Ternium's sale of its 59.7% interest in Sidor to a Venezuelan state-owned entity, stating in relevant part:

> On April 29, 2008, the National Assembly of Venezuela passed a resolution declaring that the shares of Sidor, together with all of its assets, were of public and social interest, and authorizing the Venezuelan government to take any action it deemed appropriate in connection with any such assets, including expropriation. On May 11, 2008, the President of Venezuela issued Decree Law 6058 ordering that Sidor and its subsidiaries and associated companies were transformed into state-owned enterprises (*"empresas del Estado"*), with Venezuela owning not less than 60% of their share capital. On May 7, 2009, Ternium completed the transfer of its entire 59.7% interest in Sidor to Corporación Venezolana de Guayana, or CVG, a Venezuelan state-owned entity.

205.     The foregoing statement describing Ternium's completion of the transfer of its interest in Sidor to CVG and the sale of its interest in Sidor was materially false and misleading when issued because it omitted to disclose that the transfer was facilitated through Defendants' undisclosed and illegal bribery scheme.

206.   The 2016 Form 20-F referenced the Company Code of Conduct, stating in relevant part:

> We have adopted a code of conduct that applies to all directors, officers and employees, which is posted on our website and complies with the NYSE's requirements, except that it does not require the disclosure of waivers of the code for directors and officers. In addition, we have adopted a supplementary code of ethics for senior financial officers which is also posted on our website.

207.   The 2016 Form 20-F states that the text of Ternium's code of conduct for employees is posted on its web site.  The Code of conduct in effect during the Class Period and at the time Ternium filed its 2016 20-F, as posted on Ternium's website states, in part:

> This Code of Conduct defines guidelines and standards of integrity and transparency *which must be complied with by all employees at all levels within Ternium*.
>
> This Code is applied by offices, directors and managers, the Internal Audit Department and the Ternium Audit Committee.
>
> *Agreement to comply with the provisions of this Code is a condition for employment in Ternium*.
>
> Section 5.1 Compliance with the law:  Employees must comply with applicable laws.  *All employees shall in all cases abide by the laws to which Ternium is subject, <u>including the laws in force in the different countries in which Ternium has operations or dealings</u>*.
>
> 5.12.  *Commercial Incentives; Bribery Prohibited*.  Commercial incentives must be consistent with applicable laws and market practice and must be approved in accordance with Ternium's procedures.
>
> *Employees should not give anything, for example, money, gifts, travel expenses, excessive entertainment or any other advantage to anyone, that is or could be construed as (1) intending to influence the decision of government officials or political representatives or the performance by them of a relevant function or activity, or (2) a violation of any applicable laws, or regulations…*
> *Employees should exercise particular care in dealing with government officials, which should be interpreted widely to include employees or officials of government agencies, government-affiliated entities or government-controlled entities, including government affiliated commercial entities (such as for*

63

*example, State-owned companies), to ensure there can be no suggestion of impropriety.*

**Bribery is Strictly Prohibited.**

***As set forth in Ternium, S.A.'s Policy on Business Conduct, Ternium will not condone, under any circumstances, the offering or receiving of bribes or any other form of improper payments***.

Most countries have laws that make it illegal to engage in bribery, including U.S. Foreign Corrupt Practices Act.  The OECD Anti-Bribery Convention establishes legally binding standards to criminalize bribery of foreign public officials in international business transactions.  A breach of any of these laws is a serious offence which can result in fines for Ternium and imprisonment for individuals.

208.    The foregoing statements were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: (1) Ternium in fact did not require its employees to comply with the Code of Conduct as a condition for employment: (2) Ternium knowingly condoned and engaged in the offering of bribes to government officials in order to secure favorable terms for the sale of its stake in Sidor to the Venezuelan government; (3) Ternium and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure.

209.    Ternium's 2016 20-F referenced the Company's Code of Ethics, stating in relevant part:

We have adopted a code of ethics that applies specifically to our principal executive officers, and principal financial and accounting officer and controller, as well as persons performing similar functions. We have also adopted a code of conduct that applies to all company employees, including contractors, subcontractors and suppliers.
The text of our code of ethics for senior financial officers and code of conduct for employees is posted on our web site at: http://www.ternium.com/en/ir/governance.

210.    Ternium's Code of Ethics for Senior Financial Officers Ternium referred to in its 2016 20-F states that it is intended to supplement the Company's Code of Conduct and applies to

"its principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions (collectively, the 'Senior Financial Officers')." The Code of Ethics states, in part that Senior Financial Officers will:

> Perform their responsibilities with a view to causing any reports or other documents prepared or reviewed by them, which are intended to be filed with the securities regulators having jurisdiction over the Company, or otherwise made public by the Company, to *contain full, fair, accurate, timely and understandable disclosure*; ***Comply with any governmental laws, rules and regulations applicable to their areas of responsibility; and Report without any delay and possible violation of this Code of Ethics to the Internal Audit Department.***

211.    Ternium's Code of Ethics furthers states:

> Senior Financial Officers will be held accountable for their adherence to this Code of Ethics…The Audit Committee shall approve of any waiver of or amendment to this Code of Ethics. ***Waivers from and amendments to this Code of Ethics will be promptly disclosed in the manner prescribed by securities regulations applicable to the Company….***The Company regards this Code of Ethics as its written code of ethics under Section 406 of the Act, complying with the standards set forth in SEC regulation S-K, Item 406 and Item 16B of Form 20-F.

212.    The foregoing statements that were contained in the Company's 2016 20-F and Ternium's Code of Ethics were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: (1) Ternium's Senior Financial Officers did not comply with "governmental laws, rules and regulations"  because Ternium and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure; and (2) none of Ternium's Senior Financial Officers obtained waivers and/or amendments to the Code of Ethics that were disclosed.

213.    In its 2016 20-F Ternium referenced its Policy on Business Conduct Statements stating, in relevant part: "Under NYSE standards, listed companies must adopt and disclose a code of business conduct and ethics for directors, officers and employees, and promptly disclose any waivers of the code for directors or executive officers."  Ternium's Policy on Business

Conduct referenced in its Form 20-F is posted on Ternium's website and provides that the Policy "sets forth principles and procedures designed to ensure that Ternium complies with the requirements of the Ternium Code of Conduct and various national laws prohibiting corruption which, in some cases, also criminalize bribery taking place outside their territories."

214. Ternium's Policy on Business Conduct states, in relevant part:

*Ternium expects its directors, officers and employees, its subsidiaries' Associated Persons' directors, officers and employees, and any other person or entity representing the Company or its subsidiaries to conduct themselves properly in all business-related dealings with governmental agencies or entities, companies, or other governmental entities, and their respective officers, employees and other representatives. Ternium will not authorize, participate in, or tolerate and business practice that does not comply with, or violates the intent of this Policy.*

**3.2 Management Responsibilities**

*CEO of Ternium is responsible for ensuring that Ternium and its Controlled Subsidiaries conduct business in accordance with the Policy…the CEO…shall endeavor to foster a strong "culture of compliance" throughout the group.…*The CEO has entrusted to the Chief Financial Officer (CFO) primary responsibility for this Policy as it relates to financial controls and accounting. In keeping with these responsibilities, Ternium will maintain a system of internal controls and make and keep books and records that accurately and fairly reflect transactions.

**4. Compliance with the Law**

As stated in the Ternium Code of Conduct, all persons subject to this Policy shall comply with all applicable laws, regulations and rules. *This Policy has been designed so that compliance with this Policy will result in compliance with the relevant anti-bribery statutes in the various countries where Ternium or its Controlled Subsidiaries and Associated Persons operate do business or to which it or they may be subject.*
*However, all persons subject to this Policy are required to comply with all local laws in the jurisdictions in which they are conducting business…*

**5. Giving or receiving payment for improper conduct is prohibited**
 *…no person subject to this Policy shall propose, offer, promise, pay or deliver or authorize and other person to propose, offer, promise, pay, or deliver, directly or indirectly, any Thing of Value to any Public Official in order to induce such Public Official to perform or incur in an improper conduct.*

No person subject to this Policy shall request, accept, or agree to accept, directly or indirectly any Thing of Value from any Public Official, for the purpose of performing, directly or through a third party, an improper conduct.

Things of Value should not be offered or provided to a Public Official for the purpose of:

m. Influencing an act of decision by such Public Official (or as consideration therefore);

n. Inducing such Public Official to do or omit to do any act;

o. Inducing such Public Official to use his or her influence to affect or influence, for the benefit of Ternium or any of its Controlled Subsidiaries, any act, decision or resolution; or

p. Securing any other improper advantage;

In each case in order to (i) obtain (whether from such Public Official, his/her employer or any other person or entity) a contract or other business, (ii) direct a contract or other business to any person or entity; (iii) retain business, or (iv) obtain or retain any advantage in the course of business.

***Any such offers, gifts, payments, promises, agreements and authorizations made indirectly through a Public Official are also prohibited***.

…

**5.1 No Facilitating Payments.**

This Policy does not allow "facilitating payments," or payments to Public Officials intended to expedite or secure performance of a routine administrative action from the Public Officials who ordinarily perform such actions.

5.2 **No Cash Payments**

***…no payments for services or goods to any third party shall be made in physical cash*** other than documented petty cash disbursements and the permitted payments under the Charitable Contributions Authorization Manual.

**8.1 Consequence of Failure to Comply**

Failure to comply with this Policy will be grounds for termination or other disciplinary action.

215.    The foregoing statements that were contained in the Company's Policy on Business Conduct were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: 1) Ternium authorized the payment of bribes in contravention of the Policy; 2) Ternium's CEO did not foster a culture of compliance with the Policy because he knew about or recklessly disregarded the payment of bribes to government officials; 3) Ternium and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure; 4) Ternium permitted multiple cash payments to public officials to secure favorable terms in connection with the sale of its stake in Sidor to the Venezuelan Government.

216.    Item 3.D of Form 20-F requires filers to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk, in a section headed 'Risk Factors.'"   The instructions to Item 3.D state: "Risk factors should be concise and explain clearly how the risk affects the issuer or securities."

217.    Ternium's 2016 20-F contained generalized disclosures related to price volatility and risk related to the Company's operations in Latin America as well as specific risks related to "economic and political instability in Argentina" as follows:

> **_Economic and political instability in Argentina, which on several occasions resulted in economic uncertainties and recession, may occur in the future,_**
> **_thereby adversely affecting our business, financial condition and results._**
> Our business and results of operations in Argentina depend on macroeconomic conditions, among other factors. Steel shipments to the Argentine domestic market were disrupted during the 2008-2009 downturn in the global economy. Steel shipments to the Argentine domestic market also decreased in 2016, as the country faced a significant rebalancing of the economy's relative prices in a year of macroeconomic policy changes under a new administration. The Argentine economy is currently facing significant challenges. As further discussed below, high inflation is leading to labor unrest. In addition, in the last decade, the economy was affected by supply constraints and capital investment in general has declined significantly due to, among other factors, political, economic and financial uncertainties and government actions adopted by previous

administrations, which included price and foreign exchange controls, import restrictions, export taxes, an increased level of government intervention in, or limitations to, the conduct of business in the private sector and other measures affecting investor confidence. Although the current administration removed such measures, there can be no assurance that they will not be reestablished in the future or that the Argentine government will not take additional similar measures in the future. Economic conditions in Argentina have deteriorated rapidly in the past and may deteriorate rapidly in the future. The Argentine economy may not grow and economic instability may increase. Our business and results of operations in Argentina could be adversely affected by rapidly changing economic conditions in Argentina or by the Argentine government's policy response to such conditions.

218.    Notwithstanding the disclosure requirement set forth in Item 3.D, Ternium's Item 3.D disclosures contained in its 2016 20-F were incomplete and therefore materially misleading because Defendants failed to disclose the following risks, each of which stemmed from Defendants' paying illegal bribes in exchange for favorable terms in connection with the sale of Sidor:  (i) the risk that public disclosure of the bribery scheme would result in Ternium's executives facing criminal charges in Argentina; (ii) the risk that public disclosure of the bribery scheme would result in the Company and/or its executives incurring fines and penalties; (iii) the risk that public disclosure of the bribery scheme would result in the Company's criminal and/or civil liability in the United States and other countries in which it does business; and (iv) the risk that public disclosure of the bribery scheme would result in a loss of investor confidence and a corresponding decline in the price of Ternium ADS.  Additionally, notwithstanding the litany of risks Ternium detailed related to doing business in Argentina Ternium consciously omitted to discuss the risks related to bribery and corruption providing investors with the false reassurance that such corruption was not a risk to Ternium's business.

219.    During the 2008 fiscal year, Ternium's internal control over financial reporting was ineffective because Company funds were used to pay bribes which were not accurately accounted for in the Company's financial statements.  Nevertheless, Ternium's 2008 20-F, filed

with the SEC on June 30, 2009 ("2008 20-F") falsely states that "management has concluded that Ternium's internal control over financial reporting, as of December 31, 2008, is effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes." Likewise, the Company's 2009, 2010, 2011, 2012 and 2013 20-F's each stated that Ternium's internal control over financial reporting was effective and that "there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." The Company's 2014 20-F stated that the Company's internal control over financial reporting was ineffective solely because of a control deficiency related to monitoring indicators of value for the Company's equity investments and the Company's 2015 20-F noted that the only change in internal control over financial reporting related to monitoring indicators of value for the Company's equity investments.

220. Ternium's 2016 20-F contained SOX certifications signed by Defendants Novegil and Brizzio attesting to the integrity of the Company's internal controls. Ternium's 2016 20-F states that the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes:

> **Management's report on internal control over financial reporting**
> Management is responsible for establishing and maintaining adequate internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934). Ternium's internal control over financial reporting was designed by management to provide reasonable assurance regarding the reliability of financial reporting and the preparation and fair presentation of its financial statements for external purposes in accordance with IFRS.
> …Management conducted its assessment of the effectiveness of Ternium's internal control over financial reporting based on the framework in *Internal*

*Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on this assessment, management has concluded that Ternium's internal control over financial reporting, as of December 31, 2016, is effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes.

\*\*\*

**Change in Internal Control over Financial Reporting**
During the period covered by this report, there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

221.    Because Ternium's internal control over financial reporting was ineffective in 2008, and because there were no changes to the Company's internal control over financial reporting since 2008 that remedied the fact the Company's internal control over financial reporting was ineffective because Company funds were used to pay bribes which were not accurately accounted for in the Company's financial statements, the Company's statement in its 2015 20-F concerning the effectiveness of its internal control over financial reporting is false and misleading.

222.    On May 1, 2016 Defendants Brizzio and Novegil each signed and filed SOX certifications attesting that they were responsible for establishing and maintaining disclosure controls and procedures and internal control over financial reporting and had: (i) designed such internal control to ensure that material information relating to the Company is made known to them timely, (ii) designed such internal control to provide reasonable assurance regarding the reliability of financial reporting and financial statements in accordance with generally accepted accounting principles, (ii) evaluated the internal controls over financial reporting, and disclosed any change in the company's internal control over financial reporting.  They also certified that they had reviewed the 20-F and that it does not contain any untrue statement of a material fact, or

71

omit to state a material fact, necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading. They further certified that they disclosed to the Company's auditors and board of directors (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting; and (b) any fraud, whether or not material, that involves management.

223.    Brizzio's and Novegil's certifications were false and misleading because Brizzio and Novegil were aware that: a) Ternium's internal control over financial reporting was not properly designed, was deficient, had material weaknesses, and had been circumvented by management to carry out a bribery scheme with corrupt Argentine and Venezuelan officials to secure a higher price for the sale of Ternium's interest in Sidor and b) they had not disclosed the material fraud involving Ternium's bribery scheme which subjected the Company and its executives to criminal and civil liability and reputational damage.

### *2018 False or Misleading Statements*

224.    On April 24, 2018, Ternium filed a Form 20-F for the fiscal year ended December 31, 2017 with the SEC (the "2017 20-F"), which provided the Company's year-end financial results and position. The 2017 20-F was signed by Defendant Brizzio. The 2017 20-F also contained signed SOX certifications by Defendants Vedoya and Brizzio attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

225.    The 2017 20-F provided information concerning Ternium's sale of its 59.7% interest in Sidor to a Venezuelan state-owned entity, stating in relevant part:

> On April 29, 2008, the National Assembly of Venezuela passed a resolution declaring that the shares of Sidor, together with all of its assets, were of public and social interest, and authorizing the Venezuelan government to take any action it deemed appropriate in connection with any such assets, including expropriation.

On May 11, 2008, the President of Venezuela issued Decree Law 6058 ordering that Sidor and its subsidiaries and associated companies were transformed into state-owned enterprises (*"empresas del Estado"*), with Venezuela owning not less than 60% of their share capital. On May 7, 2009, Ternium completed the transfer of its entire 59.7% interest in Sidor to Corporación Venezolana de Guayana, or CVG, a Venezuelan state-owned entity.

226.    The foregoing statement describing Ternium's completion of the transfer of its interest in Sidor to CVG and sale of its interest in Sidor was materially false and misleading when issued because it omitted to disclose that the transfer was facilitated through Defendants' undisclosed and illegal bribery scheme.

227.    The 2017 Form 20-F referenced the Company Code of Conduct, stating in relevant part:

We have adopted a code of conduct that applies to all directors, officers and employees, which is posted on our website and complies with the NYSE's requirements, except that it does not require the disclosure of waivers of the code for directors and officers. In addition, we have adopted a supplementary code of ethics for senior financial officers which is also posted on our website.

228.    The 2017 Form 20-F states that the text of Ternium's code of conduct for employees is posted on its web site.  The Code of conduct in effect during the Class Period and at the time Ternium filed its 2017 20-F, as posted on Ternium's website states, in part:

 This Code of Conduct defines guidelines and standards of integrity and transparency ***which must be complied with by all employees at all levels within Ternium***.

This Code is applied by offices, directors and managers, the Internal Audit Department and the Ternium Audit Committee.

***Agreement to comply with the provisions of this Code is a condition for employment in Ternium***.

Section 5.1 Compliance with the law:  Employees must comply with applicable laws.  ***All employees shall all in cases abide by the laws to which Ternium is subject, <u>including the laws in force in the different countries in which Ternium has operations or dealings</u>***.

5.12.  ***Commercial Incentives; Bribery Prohibited***.  Commercial incentives must be consistent with applicable laws and market practice and must be approved in accordance with Ternium's procedures.

***Employees should not give anything, for example, money, gifts, travel expenses, excessive entertainment or any other advantage to anyone, that is or could be construed as (1) intending to influence the decision of government officials or political representatives or the performance by them of a relevant function or activity, or (2) a violation of any applicable laws, or regulations…***
***Employees should exercise particular care in dealing with government officials, which should be interpreted widely to include employees or officials of government agencies, government-affiliated entities or government-controlled entities, including government affiliated commercial entities (such as for example, State-owned companies), to ensure there can be no suggestion of impropriety.***

**Bribery is Strictly Prohibited.**

***As set forth in Ternium, S.A.'s Policy on Business Conduct, Ternium will not condone, under any circumstances, the offering or receiving of bribes or any other form of improper payments***.

Most countries have laws that make it illegal to engage in bribery, including U.S. Foreign Corrupt Practices Act.  The OECD Anti-Bribery Convention establishes legally binding standards to criminalize bribery of foreign public officials in international business transactions.  A breach of any of these laws is a serious offence which can result in fines for Ternium and imprisonment for individuals.

229.   The foregoing statements were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: (1) Ternium in fact did not require its employees to comply with the Code of Conduct as a condition for employment: (2) Ternium knowingly condoned and engaged in the offering of bribes to government officials in order to secure favorable terms for the sale of its stake in Sidor to the Venezuelan government; (3) Ternium and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure.

230.   Ternium's 2017 20-F referenced the Company's Code of Ethics, stating in relevant part:

> We have adopted a code of ethics that applies specifically to our principal executive officers, and principal financial and accounting officer and controller, as well as persons performing similar functions. We have also adopted a code of conduct that applies to all company employees, including contractors, subcontractors and suppliers.
>
> The text of our code of ethics for senior financial officers and code of conduct for employees is posted on our web site at: http://www.ternium.com/en/ir/governance.

231.    Ternium's Code of Ethics for Senior Financial Officers Ternium referred to in its 2017 20-F states that it is intended to supplement the Company's Code of Conduct and applies to "its principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions (collectively, the 'Senior Financial Officers')." The Code of Ethics states, in part that Senior Financial Officers will:

> Perform their responsibilities with a view to causing any reports or other documents prepared or reviewed by them, which are intended to be filed with the securities regulators having jurisdiction over the Company, or otherwise made public by the Company, to *contain full, fair, accurate, timely and understandable disclosure*; **Comply with any governmental laws, rules and regulations applicable to their areas of responsibility; and Report without any delay and possible violation of this Code of Ethics to the Internal Audit Department.**

232.    Ternium's Code of Ethics furthers states:

> Senior Financial Officers will be held accountable for their adherence to this Code of Ethics…The Audit Committee shall approve of any waiver of or amendment to this Code of Ethics. **Waivers from and amendments to this Code of Ethics will be promptly disclosed in the manner prescribed by securities regulations applicable to the Company….**The Company regards this Code of Ethics as its written code of ethics under Section 406 of the Act, complying with the standards set forth in SEC regulation S-K, Item 406 and Item 16B of Form 20-F.

233.    The foregoing statements that were contained in the Company's 2017 20-F and Ternium's Code of Ethics were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: (1) Ternium's Senior Financial Officers did not comply with "governmental laws, rules and regulations" because Ternium and

its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure; and (2) none of Ternium's Senior Financial Officers obtained waivers and/or amendments to the Code of Ethics that were disclosed.

234. In its 2017 20-F Ternium referenced its Policy on Business Conduct Statements stating, in relevant part: "Under NYSE standards, listed companies must adopt and disclose a code of business conduct and ethics for directors, officers and employees, and promptly disclose any waivers of the code for directors or executive officers." Ternium's Policy on Business Conduct referenced in its Form 20-F is posted on Ternium's website and provides that the Policy "sets forth principles and procedures designed to ensure that Ternium complies with the requirements of the Ternium Code of Conduct and various national laws prohibiting corruption which, in some cases, also criminalize bribery taking place outside their territories."

235. Ternium's Policy on Business Conduct states, in relevant part:

*Ternium expects its directors, officers and employees, its subsidiaries' and Associated Persons' directors, officers and employees, and any other person or entity representing the Company or its subsidiaries to conduct themselves properly in all business-related dealings with governmental agencies or entities, companies, or other governmental entities, and their respective officers, employees and other representatives. Ternium will not authorize, participate in, or tolerate any business practice that does not comply with, or violated the intent of this Policy.*

**3.2 Management Responsibilities**

*CEO of Ternium is responsible for ensuring that Ternium and its Controlled Subsidiaries conduct business in accordance with the Policy…the CEO…shall endeavor to foster a strong "culture of compliance" throughout the group.…*The CEO has entrusted to the Chief Financial Officer (CFO) primary responsibility for this Policy as it relates to financial controls and accounting. In keeping with these responsibilities, Ternium will maintain a system of internal controls and make and keep books and records that accurately and fairly reflect transactions.

**4. Compliance with the Law**

As stated in the Ternium Code of Conduct, all persons subject to this Policy shall comply with all applicable laws, regulations and rules. ***This Policy has been designed so that compliance with this Policy will result in compliance with the relevant anti-bribery statutes in the various countries where Ternium or its Controlled Subsidiaries and Associated Persons operate do business or to which it or they may be subject.***
***However, all persons subject to this Policy are required to comply with all local laws in the jurisdictions in which they are conducting business…***

**5. Giving or receiving payment for improper conduct is prohibited**
 ***…no person subject to this Policy shall propose, offer, promise, pay or deliver or authorize and other person to propose, offer, promise, pay, or deliver, directly or indirectly, any Thing of Value to any Public Official in order to induce such Public Official to perform or incur in an improper conduct***.

No person subject to this Policy shall request, accept, or agree to accept, directly or indirectly any Thing of Value from any Public Official, for the purpose of performing, directly or through a third party, an improper conduct.

Things of Value should not be offered or provided to a Public Official for the purpose of:

q.  Influencing an act of decision by such Public Official (or as consideration therefore);

r.  Inducing such Public Official to do or omit to do any act;

s.  Inducing such Public Official to use his or her influence to affect or influence, for the benefit of Ternium or any of its Controlled Subsidiaries, any act, decision or resolution; or

t.  Securing any other improper advantage;

In each case in order to (i) obtain (whether from such Public Official, his/her employer or any other person or entity) a contract or other business, (ii) direct a contract or other business to any person or entity; (iii) retain business, or (iv) obtain or retain any advantage in the course of business.

***Any such offers, gifts, payments, promises, agreements and authorizations made indirectly through a Public Official are also prohibited***.
…

**5.1 No Facilitating Payments.**

This Policy does not allow "facilitating payments," or payments to Public Officials intended to expedite or secure performance of a routine administrative action from the Public Officials who ordinarily perform such actions.

5.2  **No Cash Payments**

*…no payments for services or goods to any third party shall be made in physical cash* other than documented petty cash disbursements and the permitted payments under the Charitable Contributions Authorization Manual.

**8.1 Consequence of Failure to Comply**

Failure to comply with this Policy will be grounds for termination or other disciplinary action.

236.    The foregoing statements that were contained in the Company's Policy on Business Conduct  were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: 1) Ternium authorized the payment of bribes in contravention of the Policy; 2) Ternium's CEO did not foster a culture of compliance with the Policy because he knew about or recklessly disregarded the payment of bribes to government officials; 3) Ternium and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure; 4) Ternium permitted multiple cash payments to public officials to secure favorable terms in connection with the sale of its stake in Sidor to the Venezuelan Government.

237.    Item 3.D of Form 20-F requires filers to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk, in a section headed 'Risk Factors.'"  The instructions to Item 3.D state: "Risk factors should be concise and explain clearly how the risk affects the issuer or securities."

238.    Ternium's 2017 20-F contained generalized disclosures related to price volatility and risk related to the Company's operations in Latin America as well as specific risks related to "economic and political instability in Argentina" as follows:

***Economic and political instability in Argentina, which on several occasions resulted in economic uncertainties and recession, may occur in the future,***
***thereby adversely affecting our business, financial condition and results.***

Our business and results of operations in Argentina depend on macroeconomic conditions, among other factors. Steel shipments to the Argentine domestic market were disrupted during the 2008-2009 downturn in the global economy. Steel shipments to the Argentine domestic market also decreased in 2016, as the country faced a significant rebalancing of the economy's relative prices in a year of macroeconomic policy changes under a new administration. The Argentine economy is currently facing significant challenges. As further discussed below, high inflation is leading to labor unrest. In addition, in the last decade, the economy was affected by supply constraints and capital investment in general has declined significantly due to, among other factors, political, economic and financial uncertainties and government actions adopted by previous administrations, which included price and foreign exchange controls, import restrictions, export taxes, an increased level of government intervention in, or limitations to, the conduct of business in the private sector and other measures affecting investor confidence. Although the current administration removed such measures, there can be no assurance that they will not be reestablished in the future or that the Argentine government will not take additional similar measures in the future. Economic conditions in Argentina have deteriorated rapidly in the past and may deteriorate rapidly in the future. The Argentine economy may not grow and economic instability may increase. Our business and results of operations in Argentina could be adversely affected by rapidly changing economic conditions in Argentina or by the Argentine government's policy response to such conditions.

239.    Notwithstanding the disclosure requirement set forth in Item 3.D, Ternium's Item

3.D disclosures contained in its 2017 20-F were incomplete and therefore materially misleading

because Defendants failed to disclose the following risks, each of which stemmed from

Defendants' paying illegal bribes in exchange for favorable terms in connection with the sale of

Sidor:   (i) the risk that public disclosure of the bribery scheme would result in Ternium's

executives facing criminal charges in Argentina; (ii) the risk that public disclosure of the bribery

scheme would result in the Company and/or its executives incurring fines and penalties; (iii) the

risk that public disclosure of the bribery scheme would result in the Company's criminal and/or

civil liability in the United States and other countries in which it does business; and (iv) the risk

that public disclosure of the bribery scheme would result in a loss of investor confidence and a

corresponding decline in the price of Ternium ADS. Additionally, notwithstanding the litany of risks Ternium detailed related to doing business in Argentina Ternium consciously omitted to discuss the risks related to bribery and corruption providing investors with the false reassurance that such corruption was not a risk to Ternium's business.

240.    Ternium's 2017 20-F also contained an express disclosure concerning the risks related to corruption in Brazil in the wake of the *Lava Jato* investigation and associated arrests and prosecutions for bribery and corruption:

> **Political instability could adversely affect our business, financial condition and results**. Brazil's political environment has historically influenced, and continues to influence, the performance of the country's economy. Political crises have affected and continue to affect public and investor confidence, which resulted in economic deceleration. Brazil has experienced heightened economic and political instability derived from various ongoing investigations into allegations of money laundering and corruption being conducted by the Office of the Brazilian Federal Prosecutor, including ***the ongoing Lava Jato investigation, which has had a negative impact on the Brazilian economy and political environment and contributed to a decline in market confidence in Brazil. The potential outcome of these investigations is uncertain, but they have already had an adverse impact on the image and reputation of the implicated companies***, and on the general market perception of the Brazilian economy, which experienced negative gross domestic product, or GDP, growth rates of 3.8% in 2015 and 3.6% in 2016 and a public debt rating downgrade by Moody's, Standard & Poor's and Fitch Ratings to below investment grade in 2015. We cannot predict whether the *Lava Jato* investigation will lead to further political and economic instability or whether new allegations against government officials will arise in the future. ***In addition, we cannot predict the outcome of such investigation nor its effect on the Brazilian economy and, consequently, on the results of operations and financial conditions of Ternium's businesses in Brazil.*** Within this frame of political and economic uncertainty, the Brazilian Senate voted to hold a trial on impeachment charges against former President Dilma Rousseff, who was suspended from office on May 12, 2016. Ms. Rousseff was replaced by Vice-President Michel Temer, who served as acting President until Ms. Rousseff was permanently removed from office by the Senate on August 31, 2016. President Temer's term of office is set to end in December 2018. Brazil's October 2018 election process is uncertain as former President and expected presidential candidate Luiz Inácio Lula da Silva, has been recently imprisoned following conviction under a *Lava Jato* investigation, and is potentially barred from running for office. Uncertainty on the election process may affect the Brazilian economy.

241.    The foregoing statement disclosing the risks related to Ternium based on a corruption investigation and bribery scandal in Brazil was materially false and misleading because it omitted to disclose that Ternium's own participation in a conspiracy in which Ternium had paid bribes to government officials in Argentina could and would result in the Company's criminal and/or civil liability in the United States and other countries in which it does business and the risk that public disclosure of the bribery scheme would result in a loss of investor confidence and a corresponding decline in the price of Ternium ADS.

242.    During the 2008 fiscal year, Ternium's internal control over financial reporting was ineffective because Company funds were used to pay bribes which were not accurately accounted for in the Company's financial statements.  Nevertheless, Ternium's 2008 20-F, filed with the SEC on June 30, 2009 ("2008 20-F") falsely states that "management has concluded that Ternium's internal control over financial reporting, as of December 31, 2008, is effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes."  Likewise, the Company's 2009, 2010, 2011, 2012 and 2013 and 2016 20-F's each stated that Ternium's internal control over financial reporting was effective and that "there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."  The Company's 2014 20-F stated that the Company's internal control over financial reporting was ineffective solely because of a control deficiency related to monitoring indicators of value for the Company's equity investments and the Company's 2015 20-F noted that the only change in internal control over financial reporting related to monitoring indicators of value for the Company's equity investments.

243.    Ternium's 2017 20-F contained SOX certifications signed by Defendants Vedoya and Brizzio attesting to the integrity of the Company's internal controls. Ternium's 2017 20-F states that the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes:

> **Management's report on internal control over financial reporting**
> Management is responsible for establishing and maintaining adequate internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934). Ternium's internal control over financial reporting was designed by management to provide reasonable assurance regarding the reliability of financial reporting and the preparation and fair presentation of its financial statements for external purposes in accordance with IFRS.
> …Management conducted its assessment of the effectiveness of Ternium's internal control over financial reporting based on the framework in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on this assessment, management has concluded that Ternium's internal control over financial reporting, as of December 31, 2016, is effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes.
>
> \*\*\*
> **Change in Internal Control over Financial Reporting**
> During the period covered by this report, there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

244.    Because Ternium's internal control over financial reporting was ineffective in 2008, and because there were no changes to the Company's internal control over financial reporting since 2008 that remedied the fact the Company's internal control over financial reporting was  ineffective because Company funds were used to pay bribes which were not accurately accounted for in the Company's financial statements, the Company's statement in its

2017 20-F concerning the effectiveness of its internal control over financial reporting is false and misleading.

245.    On April 24, 2018, Defendants Brizzio and Vedoya each signed and filed SOX certifications attesting that they were responsible for establishing and maintaining disclosure controls and procedures and internal control over financial reporting and had: (i) designed such internal control to ensure that material information relating to the Company is made known to them timely, (ii) designed such internal control to provide reasonable assurance regarding the reliability of financial reporting and financial statements in accordance with generally accepted accounting principles, (ii) evaluated the internal controls over financial reporting, and disclosed any change in the company's internal control over financial reporting.   They also certified that they had reviewed the 20-F and that it does not contain any untrue statement of a material fact, or omit to state a material fact, necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading.  They further certified that they disclosed to the Company's auditors and board of directors (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting; and (b) any fraud, whether or not materia,l that involves management.

246.    Brizzio's and Vedoya's certifications were false and misleading because Brizzio and Vedoya were aware that: a) Ternium's internal control over financial reporting was not properly designed, was deficient, had material weaknesses, and had been circumvented by management to carry out a bribery scheme with corrupt Argentine and Venezuelan officials to secure a higher price for the sale of Ternium's interest in Sidor and b) they had not disclosed the material fraud involving Ternium's bribery scheme which subjected the Company and its executives to criminal and civil liability and reputational damage.

## INVESTORS LEARN THE TRUTH

247.     In early August 2018 news articles in the U.S. and Argentina reported that twelve years-worth of handwritten notebooks detailing illegal political payments to Argentine government officials had led to dozens of arrests.

248.     By the end of August 2018 at least 26 high-profile individuals were arrested, with 15 prominent business leaders and two high-ranking government figures striking plea deals with the government.  Investigators also raided the homes owned by Cristina Fernandez de Kircher.

249.     On August 6, 2018, after the Argentine media reported that Hector Zabaleta was arrested and charged in the Notebooks case, Ternium issued a statement, stating that "to date, we have no knowledge or information corroborating the allegation that the meetings detailed in the Notebooks ever occurred.  As it does in every case, the Company will carry out its own internal investigation."

250.     Ternium's foregoing denial of knowledge of the bribery payments detailed in the Notebooks was false and misleading because Ternium was well aware that Betnaza instructed Zabaleta to make eight bribery payments to Argentine government officials in exchange for their intervention with Chavez over the Venezuelan government's nationalization of Sidor and compensation payments to Ternium therefor.

251.     In the coming months, the prosecution in the Notebooks Case interrogated numerous individuals charged, including Ternium's Hector Zabaleta and Luis Betnaza.  While their testimony was not public, it provided evidence that Ternium was among the companies that had engaged in the illegal bribery scheme, making a series of eight payments in bags of cash to Argentine government officials in 2008.

252.    On November 27, 2018 news outlets reported that Judge Bonadio had formally charged Defendant Rocca in the Notebooks Case.  The judge charged Rocca with payment of bribes and illicit association.

253.    The charges against Rocca came after Rocca provided a statement as part of the investigation that one of his Company's executives paid an undisclosed amount of cash to Argentine government officials in eight monthly installments in 2008. The government officials were working for then-President Cristina Fernandez de Kirchner's administration.  The payments were to speed up a compensation payment from Hugo Chavez for the nationalization of Sidor. The judge set a $103 million bond and forbade Rocca from leaving the country.

254.    On this news, Ternium's stock dropped fell $1.42 per share or nearly 5%, trading at over eight times the previous day's volume, to close at $28.02 per share on November 27, 2018, damaging investors.

## LOSS CAUSATION/ECONOMIC LOSS

255.    As a result of Defendants' materially false or misleading statements, Ternium's ADS were artificially inflated throughout the Class Period. Like other members of the Class who purchased at artificially inflated prices during the Class Period, Investors suffered an economic loss, *i.e.*, damages, when the trading price of Ternium's ADS declined upon the disclosure that corrected Defendants' alleged false or misleading statements.

256.    The damages suffered by Investors and other members of the Class were a direct result of Defendants' misrepresentations, which artificially inflated the price of Ternium's ADS, and the subsequent significant decline in the value of Ternium's ADS once the truth regarding the Company's bribes were revealed to the market, correcting the misrepresentations and/or the economic impact thereof.

257.    On November 27, 2018 news outlets reported that Judge Bonadio had formally charged Defendant Rocca in the Notebooks Case.  The judge charged Rocca with payment of bribes and illicit association.

258.    On this news, Ternium's stock dropped fell $1.42 per share or nearly 5%, trading at over eight times the previous day's volume, to close at $28.02 per share on November 27, 2018, damaging investors.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:

### Fraud-on-the-Market Doctrine

259.    Investors are entitled to rely, and will rely, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.      the omissions and misrepresentations were material;

c.      Ternium securities are traded in an efficient market;

d.      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Ternium's securities; and

e.      Investors and members of the Class purchased, acquired and/or sold Ternium securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

260.    At all relevant times, the market for Ternium ADS was an efficient market for the following reasons, among others:

86

- Ternium's ADS met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

- During the Class Period, the average weekly trading volume for Ternium ADS on the NYSE was 1,723,628 shares, which represents approximately 1% of ADS available for sale during the Class Period permitting a strong presumption of reliance;

- At least 15 stock market analysts followed Ternium and wrote a total of at least 100 reports on Ternium during the Class Period. Analysts covering Ternium included UBS, Morgan Stanley, J.P. Morgan, Goldman Sachs, Citi and Credit Suisse;

- Ternium regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- More than 15 member firms were active market-makers in Ternium ADS at all times during the Class Period;

- During the Class Period Ternium was eligible for S-3 registration (or F-3 in Ternium's case as a foreign private issuer);

- Ternium's market capitalization exceeded $2 billion on all days during the Class Period;

- Unexpected material news about Ternium was rapidly reflected and incorporated into the Company's ADS price during the Class Period. For example, when Ternium disclosed that Paolo Rocca had been indicted on November 27, 2018 Ternium's share price fell a material amount.

261.    As a result of the foregoing, the market for Ternium promptly digested current information regarding Ternium from all publicly available sources and reflected such information in Ternium's ADS price. Under these circumstances, all purchasers of Ternium ADS during the Class Period suffered similar injury through their purchase of Ternium ADS at artificially inflated prices, and a presumption of reliance applies.

### *Affiliated Ute*

87

262.    Neither Investors nor the Class need prove reliance – either individually or as a class because under the circumstances of this case, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## INVESTORS' CLASS ACTION ALLEGATIONS

263.    Investors bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased Ternium ADS during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

264.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ternium's ADS were actively traded on the NYSE. While the exact number of Class members is unknown to Investors at this time and can only be ascertained through appropriate discovery, Investors believe that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by Ternium or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

265.    Investors' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

266.    Investors will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

267.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Ternium;

(c)   whether the Individual Defendants caused Ternium to issue false and misleading statements during the Class Period;

(d)   to what extent the members of the Class have sustained damages and the proper measure of damages.

268.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.


## COUNT I

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

269.     Investors repeat and reallege each and every allegation contained above as if fully set forth herein.

270.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

271.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

272.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

273.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information

reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

274.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

275.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

276.    Had Investors and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

277.     As a result of the wrongful conduct alleged herein, Investors and other members of the Class have suffered damages in an amount to be established at trial.

278.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

279.     Investors repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

280.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

281.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

282.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and

authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

283.   Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Investors and the other members of the Class complain.

284.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Investors demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Investors as the Class representative;

B.   Requiring Defendants to pay damages sustained by Investors and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Investors and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Investors hereby demand a trial by jury.

Dated: June 17, 2019                 Respectfully submitted,

THE ROSEN LAW FIRM, P.A.

By: */s/ Sara Fuks*
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
Sara Fuks (SF 6034)
275 Madison Ave., 34th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Counsel for Plaintiffs*