UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
RANDALL ULBRICHT, *individually*
*and on behalf of all others similarly*
*situated*,

                      Plaintiff,

         - against -

TERNIUM S.A.; DANIEL AGUSTIN
NOVEGIL; MAXIMO VEDOYA;
PABLO BRIZZIO; and PAOLO
ROCCA;

                 Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-6801 (PKC) (RLM)

PAMELA K. CHEN, United States District Judge:

      This securities case arises from information uncovered in the Notebooks Case, a wide-ranging investigation into business leaders' bribery of Argentine government officials that prompted the arrest of more than two dozen high-profile individuals.  Argentine prosecutors opened the investigation after an investigative reporter gave them the handwritten notebooks of a government official's personal driver, who had for more than ten years meticulously documented his boss's receipt of illicit cash payments.  These notebooks revealed, among other information, that in 2008, persons affiliated with Defendant Ternium S.A. ("Ternium") and/or its corporate parent, Techint Group ("Techint"), bribed Argentine government officials to secure their aid in addressing Venezuela's expropriation of Ternium's Venezuelan subsidiary, Sidor.

      Defendants in this case are Ternium and several of its executives and directors.  Plaintiffs, individual stockholders who purchased securities of Ternium between May 1, 2014 and November 27, 2018 (the "Class Period"), have filed suit under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), seeking damages for what they allege were misrepresentations and omissions made by Defendants during the Class Period regarding the

1

bribery that had occurred six to ten years prior.  Defendants now move to dismiss their suit, arguing that Plaintiffs have failed to allege (1) a material misstatement or omission with particularity, (2) Defendants' scienter, and (3) loss causation.

Because, as explained below, Plaintiffs have failed to plead an actionable misstatement or omission, Defendants' motion is granted.

## BACKGROUND[1]

### I.      Factual Background

### A.      The Parties

Defendant Ternium (the "Company"), a steel product manufacturer, is a Luxembourg corporation with American Depository Shares ("ADS") publicly "traded on the New York Stock Exchange."  (Amended Complaint ("Am. Compl."), Dkt. 21, ¶¶ 2, 33.)  Ternium is a subsidiary of Techint, "a group of companies consisting of Ternium, Tenaris, Tenova, Tecpetrol[,] and Humanitas."  (*Id.* ¶ 51.)  One of Ternium's subsidiaries was a Venezuelan steel company, Sidor C.A., originally held by Techint.  (*Id.* ¶¶ 33, 53–54.)  Defendant Daniel Agustín Novegil was Ternium's Chief Executive Officer ("CEO") from 2005–2018; Defendant Máximo Vedoya has been Ternium's CEO since 2018; Defendant Pablo Daniel Brizzio has been Ternium's Chief Financial Officer ("CFO") throughout the Class Period; and Defendant Paolo Rocca has been Chairman of Ternium's Board of Directors since 2005 (collectively, the "Individual Defendants"). (*Id.* ¶¶ 33–37.).

---

[1] For purposes of this Memorandum & Order, the Court assumes the truth of Plaintiff's non-conclusory, factual allegations in the complaint.  *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Plaintiffs Payne and Ulbricht are individual investors who respectively purchased 291 and 100 of Ternium's ADS during the Class Period.  (Dkts. 1-1, 6-2; Am. Compl., Dkt. 21, ¶¶ 31, 32.)

### B.      The Nationalization of Sidor

In 2007, President Hugo Chávez of Venezuela threatened to nationalize Sidor, accusing it of operating as a monopoly.  (Am. Compl., Dkt. 21, ¶ 57.)   President Chávez ordered the nationalization on April 8, 2008, but "soften[ed]" his stance in the second half of 2008, stating that he expected a "friendly agreement" with the company.  (*Id.* ¶¶ 57, 60.)  On May 7, 2009, Ternium announced that the Venezuelan government had agreed to pay $1.97 billion for Sidor (the "Sidor Transaction"), a sharp increase from its reported first offer of $800 million.  (*Id.* ¶¶ 62, 64.)  Upon the release of this news, Ternium's stock price had the greatest rise it had seen in three years.  (*Id.* ¶ 63.)

### C.      The Notebooks Case

#### 1.      Background

In August 2018, almost a decade later, numerous business leaders and politicians in Argentina were arrested in a large-scale bribery investigation known as the "Notebooks Case." (*Id.* ¶ 69.)  The case was built upon the notebooks of Oscar Centeno, a former driver to Roberto Baratta (deputy to Argentina's former Minister of Federal Planning) who had meticulously documented the cash bribes he had transported to Argentine government officials from 2003 to 2015.  (*Id.* ¶¶ 70–74.)

## 2.    Information About Ternium

The Notebooks Case brought to light a previously unknown aspect of the Sidor sale.  Two Ternium-connected individuals, Hector Zabaleta and Luis Betnaza,[2] who were charged in the Notebooks Case gave testimony in the case in August 2018.  (*See* Am. Compl., Dkt. 21, ¶¶ 87– 127; Dkts. 21-1, 21-2.)  Zabaleta was the former director of administration at Techint, who retired from Techint prior to the Class Period but continued to carry out business for Techint.  (Am. Compl., Dkt. 21, ¶ 43.)  Betnaza has been a corporate director at Ternium since 2001.  (*Id.* ¶ 44.)

Betnaza testified that in April 2008, when the Venezuelan government declared it would nationalize Sidor, Defendant Brizzio (Ternium's then-CFO) nominated Betnaza to "ask for help" from the Argentine government in securing compensation from Venezuela as part of its nationalization of Sidor.  (*Id.* ¶ 115.)  Although Betnaza told an Argentine official early in 2008 that Techint did not make political deals, "Ternium" subsequently appealed to Argentine officials, who told "Ternium" to "make a contribution" in order to enlist their help in persuading Venezuela to pay for Sidor.  (*Id.* ¶¶ 116–17.)  Betnaza then instructed Zabaleta on making the payments to the Argentine government officials (*id.* ¶¶ 118, 126), and began to take part in "chats" with the Venezuelan government with the support and participation of Argentine officials, including the Argentine President (*id.* ¶ 122).  Defendant Novegil (Ternium's then-CEO) took part in some negotiations with the Venezuelan government as well.  (*Id.* ¶ 80.)

---

[2] Zabaleta's testimony was attached to the Amended Complaint as Exhibit A (Dkt. 21-1), Betnaza's Investigative Statement as Exhibit B (Dkt. 21-2), and Betnaza's testimony as Exhibit C (Dkt. 21-3).  In determining whether dismissal is warranted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (internal quotation and citation omitted).  Therefore, the Court treats the attached documents as incorporated into the Amended Complaint.

Zabeleta, after confirming the plan with Betnaza, coordinated the delivery of eight bribery payments in cash between April and December 2008 to Argentine Deputy Minister Baratta, who was driven by Oscar Centeno to the "second subbasement of the Ternium building" to pick up the bags of cash.  (*Id.* ¶¶ 90–91.)  Zabeleta estimated that the payments totaled between $1.14 and $1.53 million.  (*Id.* ¶ 97.)

About ten years later, on November 27, 2018, news outlets reported that Defendant Rocca (Ternium's then-Board Chairman) had formally been charged in the Notebooks Case with paying bribes to Argentine officials and illicit association.  (*Id.* ¶ 82.)  As evidence of Rocca's knowledge of the bribery, the charging document cited an audio file provided by the Argentine Business Association from an August 16, 2018 conference in which Rocca "explained in great detail the situation that occurred in Venezuela with respect to Sidor"; a statement by Betnaza that Rocca was present at an event at which bribes were requested from Betnaza by Argentine officials; and also news articles showing that Rocca "head[ed] negotiations with the Argentine and Venezuelan governments for the SIDOR plants in Venezuela."  (*Id.* ¶¶ 131–33; *see also* Dkt 21-4, at 2–3.)  The charges against Rocca were subsequently dismissed by an appeals court, but the investigation into his conduct remained open.  (Am. Compl., Dkt. 21, ¶ 135.)  The price of Ternium's ADS fell approximately $1.42 per share, or nearly 5%, on the day that the criminal charges against Rocca were reported.  (*Id.* ¶¶ 82–84.)

## II.    Procedural History

Plaintiffs filed their initial Complaint in this action on November 29, 2018.  (Dkt. 1.)  On January 31, 2019, the Court appointed Plaintiff Payne as lead plaintiff upon his motion.  (Jan. 31, 2019 Order.)  Plaintiffs filed their Amended Complaint on June 17, 2019.  (Am. Compl., Dkt. 21.)  Defendants moved for a pre-motion conference in advance of a motion to dismiss on August 16,

2019.  (Dkt. 22.)  The Court denied Defendants' motion as unnecessary and set a briefing schedule. (Aug. 26, 2019 Order.)  The instant motion was fully briefed on November 27, 2019.  (*See* Dkts. 27–29.)

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted).

"Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted); *see also Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).  In addressing the sufficiency of a complaint, courts are required to accept the well-pleaded factual allegations contained within the complaint as true, *see Bldg. Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 187 (2d Cir. 2012), but "need not credit conclusory statements unsupported by assertions of facts or legal conclusions and characterizations presented as factual allegations," *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Additionally, "a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by

documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *Id.* at 405–06 (citing *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995)).

## DISCUSSION

### I.   Plaintiffs' Section 10(b)/Rule 10b-5 Claim

Plaintiffs assert claims under Section 10(b) and Rule 10b-5 of the Exchange Act, alleging that Defendants made material misrepresentations or omissions in various corporate filings and documents issued by Ternium during the Class Period.  (*See* Am. Compl., Dkt. 21, ¶¶ 269–78.) The alleged misrepresentations and omissions all relate to the bribery scheme in which Ternium was purportedly involved between 2008 and 2009, in connection with the Sidor Transaction, which, when it came to light in November 2018 during the Notebooks Case, caused Ternium's stock price to fall.

### A.   Section 10(b) and Rule 10b-5

Under Section 10(b) of the Exchange Act, it is unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of [the] rules and regulations" that the SEC prescribes. 15 U.S.C. § 78j(b).  Rule 10b–5 implements Section 10(b), *see Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 160 (S.D.N.Y. 2018), and makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

7

17 C.F.R. § 240.10b–5; *see also Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020).

To succeed on a claim under Section 10(b)/Rule 10b–5 thereunder, a plaintiff must plausibly allege: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (alterations and footnote omitted); *see also Schwab v. E\*TRADE Fin. Corp.*, 752 F. App'x 56, 58 (2d Cir. 2018) (summary order) (same) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)); *GAMCO Invs., Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (same) (citations omitted). "Relatedly, to state a claim under Section 20(a), Plaintiffs must, at a minimum, plead a plausible 'primary violation' of Section 10(b)." *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at \*3 (S.D.N.Y. Jan. 18, 2018) (collecting cases).

Claims under Section 10(b)/Rule 10b–5 are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 629 (S.D.N.Y. 2017) (citing *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000)). "Rule 9(b) requires that the complaint 'state with particularity the circumstances constituting fraud.'" *Id.* "To satisfy that requirement, the complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Id.* (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)). Similarly, the PSLRA requires complaints brought under the Exchange Act to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission

is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u–4(b)(1).  "The PSLRA further requires that the complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind' with respect to each alleged misstatement or omission."  *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 629 (quoting 15 U.S.C. § 78u–4(b)(2)).  "A complaint will survive under that heightened standard 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)).

### B.      Alleged Misstatements and Omissions

Plaintiffs contend that Defendants were aware throughout the Class Period that the sale of Sidor had been secured by Ternium's bribery of Argentine officials, but that they nonetheless made multiple false and misleading statements to investors about the Company's business and compliance policies and practices.  (Am. Compl., Dkt. 21, ¶¶ 136–38.)  Specifically, Plaintiffs point to four types of statements and omissions made by Defendants in their Form 20-Fs throughout the Class Period that they allege were misleading.

### 1.      Statements Concerning the Sale of Sidor

Plaintiffs contend that the following description of the Sidor Transaction in Ternium's Form 20-Fs during the Class Period omitted information about the bribery scheme:

> On April 29, 2008, the National Assembly of Venezuela passed a resolution declaring that the shares of Sidor, together with all of its assets, were of public and social interest, and authorizing the Venezuelan government to take any action it deemed appropriate in connection with any such assets, including expropriation. On May 11, 2008, the President of Venezuela issued Decree Law 6058 ordering that Sidor and its subsidiaries and associated companies were transformed into state-owned enterprises ("empresas del Estado"), with Venezuela owning not less than 60% of their share capital.  On May 7, 2009, Ternium completed the transfer of its entire 59.7% interest in Sidor to Corporación Venezolana de Guayana, or CVG, a Venezuelan state-owned entity.

(*Id.* ¶¶ 141 (2013 20-F), 162 (2014 20-F), 183 (2015 20-F), 204 (2016 20-F), 225 (2017 20-F).)

Similarly, Plaintiffs contend that the following language in the 2013 and 2014 20-F's was also

false and misleading:

> ***Ternium's cash flows for 2011 and 2012 include non-recurring payments
> received in connection with the transfer of our interest in Sidor to Venezuela***. On
> May 7, 2009, [Ternium] completed the transfer of [its] entire 59.7% interest in
> Sidor to CVG. Ternium agreed to receive an aggregate amount of USD1.97 billion
> as compensation for its Sidor shares. Ternium received payments from CVG,
> including interest, totaling USD953.6 million, USD767.4 million, USD133.1
> million and USD136.7 million in 2009, 2010, 2011 and 2012, respectively. With
> the last payment in October 2012, the pending dispute relating to the nationalization
> of Sidor was resolved.

(*Id.* ¶¶ 141 (2013 20-F), 162 (2014 20-F) (emphasis in originals).)

## 2. Codes of Conduct

Plaintiffs also allege that Defendants violated the requirements set forth in three Company

policies relating to compliance with anti-bribery laws that were referenced in Ternium's Class

Period 20-Fs. (*Id.* ¶ 12.)

First, Ternium's Code of Conduct provides, *inter alia*, that "[a]ll [Ternium] employees

shall in all cases abide by the laws to which Ternium is subject, including the laws in force in the

different countries in which Ternium has operations or dealings," and that "Ternium will not

condone, under any circumstances, the offering or receiving of bribes." (*Id.* ¶ 144.)

Second, Ternium's Code of Ethics for Senior Financial Officers, which applies to

Ternium's "principal executive officer, principal financial officer, principal accounting officer or

controller or persons performing similar functions," requires such officers to ensure that all

documents filed with securities regulators "contain full, fair, accurate, timely and understandable

disclosure; [c]omply with any governmental laws, rules and regulations applicable to their areas

of responsibility; and [r]eport without any delay and possible violation of this Code of Ethics to the Internal Audit Department."  (*Id.* ¶ 147.)

Third, Ternium's Policy on Business Conduct, "designed so that compliance with th[e] Policy will result in compliance with the relevant anti-bribery statutes in the various countries where Ternium . . . [does] business," prohibits bribery and provides that the "CEO of Ternium is responsible for ensuring that Ternium [] conduct[s] business in accordance with the Policy" and that "[f]ailure to comply with this Policy will be grounds for termination or other disciplinary action." (*Id.* ¶ 151.)

### 3.    Risk Disclosures

Plaintiffs further allege that Ternium's responses to Form 20-F Item 3.D did not satisfy that provision's requirements that the Company prominently disclose risk factors "specific to the company or its industry" and that the risk factors clearly explain how the risk affects the issuer or securities.  (*Id*. ¶¶ 153, 155.)  Rather, Plaintiffs allege, Ternium's Item 3.D response "contained generalized disclosures" related to the Company's operations in Latin America, along with specific risks due to "economic and political instability in Argentina":

> Economic and political instability in Argentina, which resulted in a severe recession in 2002, may occur in the future, thereby adversely affecting [Ternium's] business, financial condition and results. . . .  [T]he economy has been affected by supply constraints and capital investment in general has declined significantly due to, among other factors, political, economic and financial uncertainties and government actions, including price and foreign exchange controls, import restrictions, export taxes, an increased level of government intervention in, or limitations to, the conduct of business in the private sector, and other measures affecting investor confidence. . . .  [Ternium's] business and results of operations in Argentina could be adversely affected by rapidly changing economic conditions in Argentina or by the Argentine government's policy response to such conditions.

(*Id.* ¶ 154 (2013 20-F); *see also id.* ¶¶ 175 (2014 20-F), 196 (2015 20-F), 217 (2016 20-F), 238 (2017 20-F).)

Ternium's 2017 20-F expressly included in this section a disclosure of the risks related to

corruption in Brazil in the wake of the *Lavo Jato* corruption and bribery investigation:

> Political instability could adversely affect [Ternium's] business, financial condition
> and results. . . .  Brazil has experienced heightened economic and political
> instability derived from various ongoing investigations into allegations of money
> laundering and corruption being conducted by the Office of the Brazilian Federal
> Prosecutor, including the ongoing *Lava Jato* investigation, which has had a
> negative impact on the Brazilian economy and political environment and
> contributed to a decline in market confidence in Brazil.  The potential outcome of
> these investigations is uncertain, but they have already had an adverse impact on
> the image and reputation of the implicated companies, and on the general market
> perception of the Brazilian economy . . . .  [Ternium] cannot predict whether the
> *Lava Jato* investigation will lead to further political and economic instability or
> whether new allegations against government officials will arise in the future.  In
> addition, [Ternium] cannot predict the outcome of such investigation nor its effect
> on the Brazilian economy and, consequently, on the results of operations and
> financial conditions of Ternium's businesses in Brazil.

(*Id.* ¶ 240.)

### 4.    SOX Certifications

Lastly, Plaintiffs point to the Sarbanes-Oxley ("SOX") certifications[3] on the Class Period

Form 20-Fs, in which Defendants Brizzio and Novegil[4] certified each year during the Class Period

that they were responsible for disclosure controls and internal controls over financial reporting,

and that the Company had adequately designed and evaluated those controls.  (*Id.* ¶¶ 140 (2013

20-F), 161 (2014 20-F), 182 (2015 20-F), 203 (2016 20-F), 224 (2017 20-F).)  The forms also

---

[3] "To safeguard investors in public companies and restore trust in the financial markets
following the collapse of Enron Corporation, Congress enacted Sarbanes–Oxley in 2002." *Digital
Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 773 (2018) (internal quotation and citation omitted).
Under Sarbanes-Oxley, each Form 20-F must contain a certification from a company's principal
executive and financial officer representing that the officers have, *inter alia*, established and
evaluated the company's internal controls, and that the report does not contain any untrue
statements or omissions of a material fact. *See* 1 Publicly Traded Corporations Handbook § 8:10
(May 2020) (citing 15 U.S.C.A. § 7241(a)).

[4] Defendant Vedoya, who replaced Defendant Novegil as CEO on March 1, 2018, signed
the Company's 2017 20-F SOX certification.  (*Id.* at ¶¶ 36, 224.)

required Defendants Brizzio and Novegil to certify that they had reviewed the 20-F and that it did not contain material misstatements or omissions, and that they had disclosed to the Company's auditors and board any fraud, whether or not material, that involved management. (*Id.* ¶¶ 159, 180, 201, 245.)

### C.      Defendants' Motion to Dismiss the Section 10(b)/Rule 10b-5 Claim

Defendants seek to dismiss Plaintiffs' Section 10(b)/Rule 10b-5 claim on three grounds: first, that it does not allege with sufficient particularity any actionable misstatement or omissions; second, that it fails to allege the Defendants acted with scienter; and third, that the Amended Complaint fails to allege loss causation. (Defendants' Motion to Dismiss the Amended Complaint ("MTD"), Dkt. 27-1, at 9–25.)  Because, as discussed below, the Court finds that the Amended Complaint fails to allege an actionable misstatement or omission, the Court addresses only that element and does not consider scienter or loss causation.

### 1.      Descriptions of the Sidor Transaction

Plaintiffs claim that Ternium's descriptions of the Sidor Transaction in its Class Period 20-Fs put the transaction "at issue," so as to trigger a duty to disclose the bribery scheme that allegedly enabled the transaction. (*See* Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Opp."), Dkt. 29, at 13–15.)  Defendants contend that the statements did not trigger a duty to disclose the bribery because they did not "attribute[ Ternium's] success to a particular cause" (*see* MTD, Dkt. 27-1, at 13–14 (citation omitted)), or address "how" Venezuela's initial nationalization of Sidor was resolved (Reply in Support of the Motion to Dismiss ("Rep."), Dkt. 28, at 4–5), and thus did not put the transaction's success at issue.  The Court agrees with Defendants.

"[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d

Cir. 2015) (internal quotation and citations omitted).  "The securities laws, however, do not impose 'a freestanding legal duty' to disclose uncharged wrongdoing or 'an affirmative duty to disclose any and all material information'; they require disclosure only when, absent disclosure, a statement would be false or misleading."  *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 296–97 (S.D.N.Y. 2019) (citing, *inter alia*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)); *see also Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) ("[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as what was revealed would not be so incomplete as to mislead." (internal quotation marks and citation omitted)).  As Defendants note (repeatedly) in their papers, "[d]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing."  (MTD, Dkt. 27-1, at 13 (quoting *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 808 (S.D.N.Y. 2018) (citations and internal quotation marks omitted)).)  Nevertheless, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."  *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (citation omitted).  "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context.  Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate."  *Id.* at 250–51 (quoting *In re Morgan Stanley Info. Fund. Sec. Litig.*, 592 F.3d 847, 366 (2d Cir. 2010)).

"[A]n allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability."  *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016) (internal quotation marks and citation omitted).  However, "[a] duty to disclose uncharged wrongdoing may [] arise when a

corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices." *Schiro*, 396 F. Supp. 3d at 296 (internal quotation marks and citations omitted); *see also In re VEON Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2017 WL 4162342, at *6 (S.D.N.Y. Sept. 19, 2017) ("[A]ccurately reported income derived from illegal sources is non-actionable despite a failure to disclose the illegality. By contrast, statements 'putting the source of those revenues at issue' may be actionable." (quoting *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006))); *Das*, 332 F. Supp. 3d at 808 ("[A] company's statements become actionable if the company attributes its success to a particular cause without also disclosing the unlawful activity that contributed to that success." (citations omitted)).

As detailed in the Amended Complaint, Ternium's 20-Fs describe the Venezuelan government's resolution and decree authorizing and ordering the Sidor Transaction, the compensation that Ternium received in exchange for the transaction, and the fact that that compensation was reflected in the Company's cash flows for 2011 and 2012. (*See* Am. Compl., Dkt. 21, ¶¶ 141, 162, 183, 204, 225.) As Defendant accurately notes, the 20-Fs do not describe the negotiation process or the reasons for the transaction. (*See* MTD, Dkt. 27-1, at 13–14.) The 2013 and 2014 forms do note that "Ternium agreed to receive an aggregate amount of USD1.97 billion as compensation for its Sidor shares" and that with these payments, the "pending dispute relating to the nationalization of Sidor was resolved," but do not otherwise address the nature of the "dispute." (*See* Am. Compl., Dkt. 21, ¶¶ 141, 162.)

The Court finds that these statements, along with the description of the governmental authorization, do not create a duty to disclose the alleged bribery. The descriptions of the Sidor Transaction in the 20-F's "accurately report[] income derived from illegal sources," *VEON*, 2017

WL 4162342, at *6, without "attribut[ing] [the Transaction's] success to a particular cause," *Das*, 332 F. Supp. 3d at 808, thereby relieving Ternium of any obligation to disclose the bribery scheme between the Company and the Argentine government.

Defendants also argue that Plaintiffs' Section 10(b) claim fails because Ternium's 20-F statements about the Sidor Transaction are "factual" and "inarguably true." (MTD, Dkt. 27-1, at 13.) *Contra* Defendants' implication, truth is not a perfect defense to a Section 10(b) claim, as "[s]tatements of fact may be actionable . . . if they are literally true but misleading through their context and manner of presentation," or if they omit information without which they are misleading. *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 765 (S.D.N.Y. 2019) (internal quotation marks and citation omitted), *reconsideration denied in part*, No. 17-CV-9178 (WHP), 2019 WL 2866113 (S.D.N.Y. July 2, 2019). Here, however, Ternium's factual description of a historical transaction is not misleading through context because it does not emphasize the transaction's "success" so as to put the reasons for that success at issue.[5] *Cf. Schiro*, 396 F. Supp. 3d at 296; *VEON*, 2017 WL 4162342, at *6 ("The references to sales and subscriber numbers in Uzbekistan without further statements regarding the nature of those numbers or their importance to [the company]'s business do not sufficiently place the company's sales in Uzbekistan at issue

---

[5] The Amended Complaint makes reference to analysts' surprise in 2008 that Ternium had received such a large price for Sidor, as compared to other companies that did not receive similar payments for nationalized companies. (*See* Am. Compl., Dkt. 21, ¶¶ 62–68.) While the contemporaneous press releases and statements regarding the sale may have put "at issue" Ternium's comparative success in getting such a price, Plaintiffs do not include in the Amended Complaint any allegations that the descriptions of the Sidor Transaction in the Class Period 20-Fs showcased the Company's success or were made in a context that would suggest that they were intended to reassure investors. Indeed, even the factual description of the cash Ternium received in the transaction involved payments in 2011 and 2012, two years before the start of the Class Period. (*See id.* ¶¶ 141, 162.)

so as to require further disclosure regarding the bribes paid to [the daughter of the President of Uzbekistan].").

The cases that Plaintiffs cite in support of their argument (Opp., Dkt. 29, at 14) all involve situations where the company being sued for violating Section 10(b) either omitted the illegal source of income while emphasizing the legal sources, or otherwise touted their current success or future prospects. *See In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 721 (S.D.N.Y. 2019) (finding that defendant-company had put revenue at issue and thereby triggered duty to disclose underlying bribery statements where an executive boasted on an earnings call that despite increasing competition, the company "h[eld] the rights to the next three soccer World Cup's that are extremely relevant for Mexico"); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 444 (S.D.N.Y. 2018) (finding that plaintiffs had sufficiently alleged a duty to disclose where corporate statements listed three legitimate reasons for competitive advantage but omitted illegal bribery scheme); *VEON*, 2017 WL 4162342, at *6 (finding company's statements that attributed growing revenues to "improving macroeconomic situation, product quality and efficient sales and marketing efforts," and stated the growth "demonstrat[ed] the underlying strength of [the Company's] core," impermissibly put at issue the source of revenue growth without disclosing bribes (record citation omitted)); *Virtus*, 195 F. Supp. 3d at 537 (holding that defendant's statements regarding the source of "strong relative investment performance," where that performance was described as "a key driver of [defendant's] high levels of sales and net flows," were actionable misstatements because the company failed to disclose other sources of strong investment performance (record citations omitted)); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 16-CV-06509 (WHW) (CLW), 2018 WL 3772675, at *17 (D.N.J. Aug. 8, 2018) (concluding that company's statements in SEC disclosures that its "Indian subsidiaries . . . are eligible for

17

certain income tax holiday benefits granted by the Indian government for export activities conducted within Special Economic Zones, or SEZs," and indicating intent to develop new facilities in SEZs, "put the underlying bribery at play" by "touting the benefits" of SEZ licenses secured by bribery (record citations omitted)).  By contrast, Ternium's 20-F descriptions of the Sidor Transaction did not represent it as a competitive advantage or success for the Company, or suggest the reasons behind the Sider Transaction, and therefore fail to support Plaintiffs' Section 10(b) claim.  *Cf. Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11-CV-4665 (PGG), 2014 WL 4832321, at *17 (S.D.N.Y. Sept. 29, 2014) ("[A]lthough a defendant does not have a Rule 10b-5 duty to speculate about the risk of future investigation or litigation, if it puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success." (internal quotation marks and citation omitted)).

## 2.    Codes of Conduct

Defendants' statements regarding Ternium's Code of Conduct, Code of Ethics, and Policy on Business Conduct also are not actionable.  "There is an important difference between a company's announcing rules forbidding bribery and its factually representing that no officer has engaged in such forbidden conduct."  *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 756 (S.D.N.Y. 2017) (citing *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 360 (S.D.N.Y. 2015)); *see also PetroChina*, 120 F. Supp. 3d at 360 ("Although the Company's codes of ethics prohibit bribery and other forms of fraudulent conduct, they do not claim that [the company]'s officers are abiding by them.  Since the S[econd] A[mended] C[omplaint] does not challenge the actual existence of these rules, nor [company']s description of them, [p]laintiffs have not demonstrated that the Company's statements were false or misleading." (citation omitted)).  Here, as Defendants note, the generalized statements in Ternium's codes "did not guarantee any degree

of compliance with those codes and policies during the years in which they were made." (MTD, Dkt. 27-1, at 10.) Instead, the codes contain "aspirational language characteristic of puffery," *Das*, 332 F. Supp. 3d at 806, which is non-actionable, *see Schiro*, 396 F. Supp. 3d at 298 ("Many of the statements were preceded by explicitly aspirational language . . . thus unmistakably signaling that they were statements about goals, not statements of fact." (record citation omitted)). (*See* Am Compl., Dkt. 21, ¶ 144 ("All employees *shall* in all cases abide by the laws[.]" (emphasis added) (Code of Conduct)); *id.* at ¶ 148 ("Senior Financial Officers *will* be held accountable for their adherence to this Code of Ethics." (emphasis added) (Code of Ethics)); *id.* at ¶ 151 ("[T]he CEO . . . *shall* endeavor to foster a strong 'culture of compliance' throughout the group." (emphasis added) (Policy on Business Conduct)).) Without any "historical representation by [Ternium] to the effect that its officers had uniformly abided by the[] rules" contained in the Codes at issue, Plaintiffs cannot show a false or misleading statement to support a claim under Section 10(b)/Rule 10b-5.[6] *Braskem*, 246 F. Supp. 3d at 756.

### 3.    Risk Disclosures

The Court also finds that Plaintiffs have not alleged sufficient facts from which to infer that Ternium's Class Period Form 20-F risk disclosures contain actionable misrepresentations. The Amended Complaint alleges that, by omitting the bribery scheme, Defendants failed to make the appropriate risk disclosures required by Item 3 of Form 20-F. (Am. Compl., Dkt. 21, ¶ 15.)

---

[6] "Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 659 (citation omitted). Plaintiffs claim in their Opposition, but not in the Amended Complaint, that "Ternium made these representations to comfort investors because other Latin American companies, such as Petrobras[,] were then mired in bribery scandals that had caused those companies' stock prices to decline." (Opp., Dkt. 29, at 8.) However, neither the Opposition nor the Amended Complaint alleges that these statements were made specifically in response to any particular inquiries regarding *Ternium*'s ethics or activities, and so do not allege that the statements were made misleading via "context." *See Das*, 332 F. Supp. 3d at 807.

Specifically, Plaintiffs contend that disclosures that "economic and political instability in Argentina . . . *may* occur in the future, *thereby* adversely affecting our business, financial condition and results" were misleading because "these risks were not just possible, but in fact had already materialized." (Opp., Dkt. 29, at 15 (emphasis in original).)

Plaintiffs cite *In re Facebook, Inc. IPO Securities and Derivative Litigation.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("*Facebook*"), for the proposition that "purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized." (*Id.*) Preliminarily, the Court notes that *Facebook* did not deal with Section 10(b) claims and did not involve the heightened pleading standard that applies here. *See Facebook*, 986 F. Supp. 2d at 506. More relevantly, as Defendants point out (*see* Rep., Dkt. 28, at 5–6), *Facebook* involved the disclosure of a risk that was already a reality: the company included in its 20-F filing the statement that "increased mobile usage and product decisions '*may* negatively affect Facebook's revenue' when, in fact, these factors allegedly '*had* [already] negatively impacted [the Company's] revenue.'" *Facebook*, 986 F. Supp. 2d at 514. The court in *Facebook* found that, under these facts, the plaintiff-investors had adequately alleged a violation of Item 303 of Regulation S–K, which covers company management's discussion and analysis of financial condition and results of operations. *Id.* at 506, 514 (citing 17 C.F.R. § 229.303(a)(3)(ii)). Here, the Amended Complaint does not allege that harm to Ternium's business had already occurred at the time of the Class Period disclosures, but simply that the risk factors—*i.e.*, governmental corruption in Argentina—that could give (and later did) give rise to such harm—*i.e.*, the drop in Ternium's stock prices in 2018 following the revelations from the Notebook Case—were already in play.

"Absent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoing or mismanagement."[7] *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 650 (internal quotation marks and citation omitted).  "That well-established principle would be entirely meaningless if every reporting company were required to disclose uncharged, unadjudicated conduct in the risk-factors sections of its filings." *Id.* at 651. In *Banco Bradesco*, a case involving underlying allegations of bribery similar to those at issue here, the court found that the company did not have a duty to disclose the allegations of bribery, even though the company's 20-F referenced not only the general risks of "failure, deficiencies or the inadequacy of internal processes, people, systems and external events" and "legal risk associated with the activities we carry out," *id.* at 651 (record citation omitted), but also the same *Lava Jato* investigation and risks mentioned in Ternium's 20-F disclosures, *see id.* at 621, 655–56.  Similarly, Ternium's references to future "economic and political instability" in Argentina and to the *Lava Jato* investigation are insufficient to trigger a duty to disclose the uncharged bribery for the purposes of Item 3.D on its 20-Fs.  To require disclosure of past bribery under these circumstances would void "the principle that companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *Id.* at 652 (internal quotation marks and citation omitted).

Thus, Plaintiffs have failed to state a claim under Section 10(b) based on Defendants' 20-F, Item 3.D statements.

---

[7] The scope of the disclosure duty under Item 3.D is "not well defined." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 650 (noting that the "Risk Factors" section described in Item 3.D "is intended to be a summary of more detailed discussion contained elsewhere in the document," and that Form 20–F provides "several examples of the kinds of risk factors that may be included, none of which describe, or even encompass or approximate, uncharged and/or unadjudicated illegal conduct" (citation omitted)).

### 4. SOX Certifications

Nor can Plaintiffs state a claim based on Defendants' SOX certifications.  Plaintiffs principally challenge two aspects of the certifications: the certifications that Defendants Brizzio and Novegil had designed and evaluated the Company's internal controls to be adequate (Am. Compl., Dkt. 21, ¶¶ 159, 180, 201, 222, 245), and their certifications that they had disclosed to the Company's auditors and board any fraud, whether or not material, that involved management (*id.* ¶¶ 140, 159, 180, 201, 245).

As Defendants note, Plaintiffs have not alleged any facts regarding the structure of Ternium's internal controls.  (Rep., Dkt. 28, at 4 (citing *Emps. Ret. Sys. of City of Providence v. Embraer S.A.*, No. 16-CV-6277 (RMB), 2018 WL 1725574, at *10 (S.D.N.Y. Mar. 30, 2018) ("Plaintiff does not allege facts regarding the structure of [the company]'s internal controls, or how they failed during the Class Period." (citation omitted))).)  Courts in this Circuit have rejected internal controls claims where the plaintiffs have similarly "not pled any facts pertaining to defendants' internal structure for financial reporting, much less that defendants lacked adequate internal controls." *Braskem*, 246 F. Supp. 3d at 758 (alterations omitted) (internal quotation marks and citations omitted); *see also PetroChina*, 120 F. Supp. 3d at 359 (noting that allegations that company officials were engaging in bribery did not mean that "the Company had flawed internal controls over financial reporting").  To the extent Plaintiffs attempt to state a claim that the controls were demonstrably insufficient because the controls failed to catch the alleged bribery, that argument is legally foreclosed.  *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 648 ("[A]llegations that th[e] controls must have been deficient because they may have failed to detect some weaknesses in its financial reports or disclosures in some instances, are not sufficient." (citations omitted)); *cf. Embraer*, 2018 WL 1725574, at *10 (finding that allegations of internal

22

control failure were insufficient where plaintiff "failed to allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why." (internal quotation marks and citation omitted)).

Plaintiffs also argue that the Class Period SOX certifications were false because Defendants Brizzio and Novegil failed to disclose the 2008 bribery scheme even though they certified that they had disclosed "any fraud, whether or not material, that involves management." (Opp., Dkt. 29, at 9, 16.)  Defendants respond that the bribery scheme as alleged in the Amended Complaint (1) did not involve management, as it was allegedly conducted by Zabaleta, who was no longer employed by Ternium at the time of the bribery, and Betnaza, a corporate director rather than a manager[8]; and (2) took place long before the period of time covered by the certification.

---

[8] To the extent Plaintiffs contend that Defendants failed to disclose involvement in fraud by the Individual Defendants who are members of management, rather than by Zabaleta and Betnaza, Plaintiffs have not pleaded with particularity the participation of any Individual Defendant in the bribery scheme.  The Amended Complaint makes no allegations regarding Defendant Vedoya except that he became CEO in 2018.  With regard to Defendant Brizzio, the Amended Complaint alleges only that he "nominated" Betnaza to "ask for help from the Argentine national government."  (Am. Compl. Ex. B, Dkt. 21-2, at ECF 27; Ex. C, Dkt. 21-3, at ECF 4–5; Ex. D, Dkt. 21-4, at ECF 3.)  (Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination).  The Amended Complaint does not allege that Brizzio told Betnaza to bribe the government, and, indeed, Betnaza's testimony indicates that he declined repeated requests from Argentine officials to pay bribes for almost a year after beginning negotiations.  (*See* Am. Compl. Ex. C, Dkt. 21-3, at 4–5; Am. Compl., Dkt. 21, ¶ 117.)  With regard to Defendant Novegil, the Amended Complaint alleges only that he attended meetings in Venezuela to negotiate with government officials over the sale of Sidor with Betnaza, who supervised the bribery.  (Am. Compl., Dkt. 21, ¶¶ 80, 85.)  Plaintiffs assert in their Opposition that Novegil's "permission was required for all major transactions involving Sidor, including the bribe payments" (Opp., Dkt. 29, at 19 (record citation omitted)), but this allegation is not actually contained in the Amended Complaint and is, in any event, conclusory.  These allegations are insufficient to demonstrate participation in the fraud (or likely scienter).  *See PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017) (collecting cases, and explaining that conclusory assertions that allegedly fraudulent activities were performed at defendants' direction or with their knowledge do not suffice to plead participation in fraud).  As to Defendant Rocca, he is a corporate director at Ternium rather than a member of management.  (*See* Am. Compl., Dkt. 21, ¶ 34.)

(*See* Rep., Dkt. 28, at 4.)  The Court agrees with Defendants that this claim is untenable for both reasons.  The cases cited by Plaintiffs in support of this theory, *In re Lihua International, Inc. Securities Litigation*, No. 14-CV-5037 (RA), 2016 WL 1312104 (S.D.N.Y. Mar. 31, 2016), and *In re Sadia, S.A. Securities Litigation*, 643 F. Supp. 2d 521 (S.D.N.Y. 2009), both involved illicit activity by company executives that took place during the period of time covered by the filing at issue.  While, following the logic in these cases, Plaintiffs might have a Section 10(b)/Rule 10b-5 claim had they alleged that Defendants failed to disclose fraud by Ternium management that occurred during the period covered by the SOX certifications, no false statement claim lies here, where the alleged fraud occurred years before the period covered by the filing and did not involve Ternium management.  (*Cf.* Investigative Statement of Luis Betnaza, Am. Compl. Ex. B, Dkt. 21-2, at ECF 26 (noting that "[a]t that time I was nominated by Mr. Pablo Brizzio [to secure the Sidor transaction] . . . because by not having been management, we had less exposure to the extortion by the Venezuelan government [in its efforts to nationalize Sidor]").)  The present-tense nature of the SOX certifications—"any fraud that *involves* management" (Am. Compl., Dkt. 21, ¶¶ 159, 180, 201, 222, 245)—only reinforces the temporal limits of the certification at issue and thus its inability to give rise to a cause of action for fraud.

*       *       *

Because Plaintiffs have failed to adequately allege an actionable misstatement or omission, a necessary predicate for a claim under Section 10(b)/Rule 10b-5, this claim is dismissed, and the Court need not, and declines to, reach the parties' arguments regarding scienter or loss causation.

## II.   Plaintiffs' Section 20(a) Claims

Plaintiffs also bring claims against the Individual Defendants under Section 20(a) of the Exchange Act, which imposes liability on individuals who control any person or entity that violates Section 10(b). *See* 15 U.S.C. § 78t(a). "To assert a *prima facie* case under Section 20(a), a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *PetroChina*, 120 F. Supp. 3d at 369 (internal quotation marks and citation omitted). Because control-person liability depends upon a primary violation of the securities laws, Plaintiffs' "[Section 20(a)] claims must be dismissed because Plaintiffs have failed to allege a primary violation under § 10(b)." *Id.* (citations omitted).

## III.   Leave to Amend

Plaintiffs have moved for leave to amend their pleading, "albeit in a cursory [sentence] at the end of their response brief." *Cf. Schiro*, 396 F. Supp. 3d at 308. (*See* Opp., Dkt. 29, at 25.) Under Rule 15(a), a court "should freely give leave" to a party to amend its pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). This rule is a "permissive standard," *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011)), although leave to amend may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (internal quotation marks and citation omitted).

Although the Court is "skeptical that the flaws in the Amended Complaint can be remedied, the Court will allow Plaintiffs to amend their pleading." *Schiro*, 396 F. Supp. 3d at 309. Notably, even where Plaintiffs "have not specified how they would amend their pleading if granted leave to

do so, the Second Circuit has admonished district courts that 'complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend.'" *Id.* (quoting *Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017)).  Because Plaintiffs have not yet had an opportunity to amend their complaint in response to a court order pointing out the deficiencies in their pleading,[9] the Court will afford them an opportunity to do so.[10]

---

[9] Though the Court does not reach the parties' scienter or loss causation arguments in this Memorandum & Order, it notes that, were it to address those arguments, it would likely find that Plaintiffs have not alleged sufficient facts to show scienter at least on the parts of Defendants Vedoya, Novegil, and Brizzio, and perhaps on the parts of Defendants Rocca and Ternium. "Conscious misbehavior or recklessness may be inferred where defendants (1) engaged in deliberately illegal behavior; (2) knew facts or had access to information suggesting that their public statements were not accurate; or (3) failed to check information they had a duty to monitor. Where, as here, a plaintiff cannot make a showing of motive, the strength of the circumstantial allegations must be correspondingly greater." *Gagnon*, 368 F. Supp. 3d at 774 (internal quotation marks and citations omitted).  Allegations of scienter based solely on a defendant's "corporate position are entitled to no weight," *Avon*, 2014 WL 4832321, at *19, and "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information," *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 391 (S.D.N.Y. 2019) (citing *Novak*, 216 F.3d at 308).  Should Plaintiffs attempt to replead their amended complaint, the Court cautions them that allegations of scienter must be pleaded with particularity with respect to each Defendant, and must include information regarding the specific "reports or statements" alerting Defendants to the alleged misconduct.  *Cf., e.g.*, *In re Henry Schein, Inc. Sec. Litig.*, No. 18-CV-1428 (MKB), 2019 WL 8638851, at *18 (E.D.N.Y. Sept. 27, 2019) (finding the allegation that defendant was "'in the room' where strategy discussions occurred . . . too vague to support an inference of scienter, as [p]laintiff fails to identify when the alleged meetings occurred, how often they occurred, what was said in the meetings, who said what, and whether [defendant] heard what was said") (collecting cases)).

[10] The Court will not grant further leave to amend after this instance, "unless Plaintiffs provide a detailed indication of what facts they would add to cure the pleading's defects (and, ideally, a redlined proposed Third Amended Complaint) with an explanation of why the amendment would not be futile."  *Schiro*, 396 F. Supp. 3d at 309.  Indeed, the Court notes that Plaintiffs have already had an opportunity to amend their complaint with greater specificity. (*Compare* Complaint, Dkt. 1 (totaling 19 pages), *with* Am. Compl., Dkt. 21 (totaling 94 pages and with additional pages of exhibits).)

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted in full.[11]  Plaintiffs'

motion for leave to amend their complaint, however, is granted, and Plaintiffs have until

**November 13, 2020** to file a Second Amended Complaint, after which Defendants will have

twenty-one (21) days to answer or file a pre-motion conference request to file a second motion to

dismiss.  If Plaintiffs fail to file a Second Amended Complaint by that date, this case will be

dismissed with prejudice.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 14, 2020
        Brooklyn, New York

---

[11] The PSLRA requires that the Court "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion."  15 U.S.C. § 78u–4(c)(1).  Here, neither the claims nor defenses were harassing or frivolous, and all factual contentions had evidentiary support or were reasonably based on belief or a lack of information.  *See* Fed. R. Civ. P. 11(b).  Furthermore, Defendants did not affirmatively allege any improper conduct or move for sanctions.  *See id.*  In accordance with the PSLRA, the Court finds that the parties and counsel in this matter have complied with Rule 11(b).